42 555
73 371

# Mississippi and Tennessee Railroad Company v. Jenkins Devaney.

1. CORPORATIONS: RAILROAD COMPANIES: POWER TO TAKE LANDS *in invitum*, FOR THE PURPOSE OF RELOCATING AFTER COMPLETION OF FIRST LOCATION. — Railroad companies have the power to relocate the line of their road after the completion of it under the first location, and to condemn for the purposes of such relocation private property, if there be a manifest necessity for the change, and no detriment thereby accrues to the public.

2. SAME: CASE IN JUDGMENT. — The Mississippi and Tennessee Railroad Company, on the first location of their road, connected with the road of the Mississippi Central Railroad at Grenada, immediately south of the Yallobusha river. The bridge across the river was destroyed during the war, and the structure being a costly one, and the embarrassed financial condition of the Company being such that they could not rebuild, in connection with the Mississippi Central Railroad Company, whose road ran nearly parallel to the road of plaintiffs in error, a partnership bridge was constructed across the river, on the line of the Mississippi Central road. On the north side of the river, and a short distance from it, plaintiffs in error relocated their road so as to make a connection with the Mississippi Central road and give both roads the use in common of the partnership bridge. This relocation was made on the lands of Devaney. *Held* — That the Mississippi and Tennessee Railroad Company had the power to take the lands *in invitum* of Devaney, for the purpose of relocating their road as indicated.

3. SAME: SAME: SAME: UNDER POWER TO REPAIR AND MAINTAIN, RAILROAD COMPANIES HAVE RIGHT TO CONDEMN LANDS FOR A RELOCATION. — The Mississippi and Tennessee Railroad Company, under the provision in their charter vesting the company "with all the rights, privileges, and powers requisite and necessary for the construction and repair and maintenance of the road," are empowered and authorized to take lands *in invitum*, after the location and completion of their road, for the purpose of relocating a portion of their line of road, if the necessity to exercise the power be the preservation of some existing right, which would otherwise be impaired.

4. TRESPASS: COLOR OF TITLE: ENTRY UPON LAND IN GOOD FAITH WITHOUT TITLE, DOES NOT MAKE PARTY A NAKED TRESPASSER, ENTITLED TO VALUE OF IMPROVEMENTS. — One who enters upon land in good faith, and under the belief that he has the title thereto, when in fact the title is in another, is not a naked trespasser, and is entitled to all legal protection to improvements and property placed upon the premises, given by the statute to parties in possession under color of title.

5. SAME: CASE IN JUDGMENT. — The Mississippi and Tennessee Railroad

Company had the land of Devaney regularly condemned by a jury of review, and tendered him the amount of damages assessed by the jury. In good faith, and under the belief that the title to the land was vested in them by the condemnation of the jury of review, the Mississippi and Tennessee Railroad Company located and built their road through Devaney's land. *Held* — That though the action of the jury of review was void, and the title to the land never vested in the Mississippi and Tennessee Railroad Company, they were not naked trespassers, but claimed under a color of title, and were entitled to the property placed upon the land.

ERROR to the Circuit Court of Yallobusha county. Hon. Wm. Cothran, judge.

The Mississippi and Tennessee Railroad connected with the Mississippi Central Railroad at Grenada, immediately south of the Yallobusha river. This connection was made in 1861. In 1863, the bridges of both roads across the Yallobusha river were burned by the military forces. Both roads being in an embarrassed financial condition after the close of the war, in 1865, agreed to build, upon the piers of the Mississippi Central Railroad bridge, which were left standing, a partnership bridge. By the arrangement, the cars of the Mississippi and Tennessee road were to use the track of the Mississippi Central road from Grenada to a point north of the Yallobusha river. This arrangement necessitated a change in the location of the Mississippi and Tennessee road, and a connection with the Mississippi Central road north of the river, instead of south as before. The relative positions of the two roads, their points of connection in 1861 and 1865, and the line of the relocation of the Mississippi and Tennessee road, are shown in the following diagram.

The question involved in the case is as to the right of plaintiffs in error to relocate their road across the land of Devaney, defendant in error. The opinion of the court contains a full history of the case.

*White and Chalmers* for plaintiffs in error.

The theory of these cases, as presented by the appellee, Devaney, through the briefs of his attorneys, is, that the Mississippi and Tennessee Railroad Company, having made in the town of Grenada, in the year 1861, one connection with the Mississippi Central Railroad, exhausted its power under its charter to connect with that road. Hence they argue that the jury of review and condemnation of Devaney's land north of the Yallobusha river, which took place on the 11th of November, 1865, was absolutely void, and conferred no power whatever; that the amended charter did not, and could not, ratify this void proceeding; that the Company, in entering upon Devaney's land under this void proceeding (though after the amended charter), without having a new jury and condemnation, were mere naked trespassers; consequently they say that when the second jury of review and condemnation was had, which was two years after the connecting branch had been built, said second jury of review (from whose decision this appeal is taken) ought, in estimating Devaney's damage, to have allowed him, in addition to the value of his land taken, the full value of the railroad track which the Company had built upon his land, as trespassers, and which had thereby become his.

In the ejectment suit, No. 11,057, they argue that the Company is liable in ejectment, because they entered upon appellee's land without having tendered to him the full amount of his damages, to wit: the full amount of the value of the road-bed, as well as the value of the land itself; that the tender the Company made of the value of the land was not sufficient.

The Circuit judge charged these several propositions as being the law, and consequently the appellee had verdict in both suits.

It is of the error committed (as we conceive) in thus charg-

ing the law, that we complain, and on account of which we ask a reversal. Let us examine these several assumptions of appellee.

1st. Is it true that a railroad company, which is authorized by its charter to connect with another road, exhausts its whole power by making one connection, and can never thereafter make another under any circumstances, however trifling the deviation may be ?

Upon this proposition I shall content myself with referring to the very full and satisfactory brief of my colleagues, Messrs. Clapp, Vance & Anderson, on file; particularly, however, calling the attention of the court to the fact that this very identical question is conclusively answered in the negative by the Supreme Court of South Carolina in two cases. Nor does it appear that the fact that the Constitution of that State contained no prohibition against taking private property for public use, had anything to do with the decision of the question as assumed by counsel for appellee ; on the contrary, the decisions rest entirely upon the charters of the companies, which did contain a provision upon the subject of taking land for the use of the roads similar to the one found in our charter. 2 Richardson, 434; 9 ib. 228. But, however this question may be decided, there are two reasons why it does not affect the cases at bar :

1st. Because there has not really been any new connection made.

2d. Because the authority to do what was done is ample in the clauses of the charter relating to repairs.

As to the first point, we insist that the real " *connection* " of the two roads is now and ever has been in the town of Grenada. The word " connection," as used in the charter, does not refer to the actual physical contact of the iron of the two roads, but to a business connection — that point at which one road really ceased and the other began, where cars and passengers and freight ceased to pay tribute to the one and began to pay tribute to the other. The town of Grenada lies immediately on the south bank of Yallobusha river ; the cars of the Mississippi and Tennessee Railroad coming from the north, instead of

crossing the river upon a bridge of its own, as before the war, now come into the town across the bridge of the Central road, running for that purpose on to the track of the Central road on the north side of the river. Is this a new " connection " which the road has made, or is it only a slight change in the *mode* of making the *same* connection? Where is the present " connection " in the sense of the charter? Unquestionably, now, as ever, in the town of Grenada. Suppose the charter had prescribed that the connection of the two roads should be at the town of Grenada, would not the way in which the road now runs have been a substantial compliance with such a provision? If the charter had so provided, and the road had been originally built as it now is, and Devaney's land been condemned for such a route, could he, after such condemnation, have treated the Company as trespassers and wrong-doers in entering upon his land? It is believed that this question must be answered in the negative; if so, it is decisive of the case.

But again, it is believed that full authority to do what was done is contained in that portion of the charter relating to repairs. The bridge and a small portion of the track having been destroyed during the war, it became necessary for the Company to repair it. The charter provides:

SECTION 7. " That the President and Directors be and they are hereby vested with all the rights, privileges, and powers requisite and necessary for the construction and repair and maintenance of a railroad to be located as aforesaid."

SECTION 8. " That said corporation be and they are hereby authorized to cause such examinations to be made on the ground before indicated, as shall be lawful for said corporation, by its members, officers, or agents, to enter upon, and take possession of all such *lands,* timbers, stone, gravel, earth, or other material, as may be necessary for the construction or *repair* of said railroad and the requisite erections." *Acts of* 1852 (*called session*), pp. 33, 34.

It will be observed that in both sections the word " repairing " is used; the Company is vested with all the powers " necessary " to keep the road in repair; they are authorized to enter

upon and take possession of all such " *lands*, timbers, stone, gravel, earth, and other materials," as may be necessary for " *repairing* " the road. Now it will scarcely be contended that the power to repair is exhausted by being once used. Whatever they can do once in order to repair, they can do again and. again. What can they do for this purpose ? — they have all the powers " necessary " for the purpose, provided that if they take private property they must buy it, or have it assessed, condemned, and paid for, or tender of payment made. With this proviso, then, what powers may be considered " necessary " ?

The word " necessary " is a legal word, and has received a legal and well-settled definition. It does not mean alone such things as are absolutely indispensable in order to repair—such things as that, if they were omitted, the repair could not be done. It has no such contracted signification. It means all such things as are not inconsistent with, but are, on the contrary, directly in aid of the repair, such as are appropriate to the repair, plainly adapted to and promotive of it. If, then, the steps taken by the Company were adapted to and promotive of the repair and maintenance of their road, they are embraced within the provisions of the seventh section. Being embraced in a provision for " the repair and maintenance" of the road, it necessarily follows that they cannot be exhausted by one exercise of them, but must, *ex vi termini*, be used as often as occasion requires. That they were adapted to and promotive of the repair and maintenance of the road, no one will question.

Chief-Justice Marshall, in discussing the meaning of the word " necessary," as used in the Constitution of the United States, says : " Does it exclude the choice of means, and can Congress in each case do that only which is most direct and simple ? Is it true that this is the sense in which the word ' necessary ' is always used ? Does it always import a physical necessity so strong, that one thing to which another is necessary cannot exist without that other ? We think it does not." . . . . .
. . . . . . " Let the end be legitimate, let it be within the scope of the Constitution (charter), and all the means which are appropriate, which are plainly adapted to the end, which are not

prohibited by, but are consistent with the letter and spirit of the Constitution (charter), are constitutional." *McCulloch* v. *State of Missouri*, 4 Wheaton, 413.

Again: The Company are vested with authority, by the eighth section, " to enter upon and take possession of all such ' *lands*,' timbers, stone, gravel, *earth*, or other material, as may be necessary for the construction or repair of said railroad."

It will be observed that, for the purpose of making " repairs," the Company may enter upon and take possession of all such " lands " as may be necessary. Now, how can it ever be necessary for the Company to enter upon " lands," in order to make repairs, unless in making said repairs the road-bed or track is changed? It will not do to say that the word " lands " means the dirt necessary for that purpose, because in the same sentence and for the same purpose they are authorized to take " earth, timber, stones, and gravel " — in other words, all the component parts of the land. Then, too, the plural number, " lands," is used, and not the singular number, " land." It is believed that no instance can be given in the English language where the word is used in this way to denote the mere dirt or earth or soil ; and the inference is irresistible, that the Company is by this clause authorized to acquire by condemnation the right of eminent domain, the fee-simple in all lands "necessary for repairs." If so, then the first condemnation was legal ; the title to the land vested in the Company from the date of the tender of the amount of the verdict, and it never has been Devaney's since.

But we insist further, that even if we be mistaken in all that goes before, if the power of connection was exhausted, if the action of the Company is not justified by the provisions either of the seventh or eighth sections of the charter, that even then the charges of the court were erroneous, and the cases must be reversed.

The charges, and indeed the whole theory of appellee's case, are based upon the assumption that appellant's road-bed and iron, when fastened down to the soil, became what is technically called " fixtures," and as such became the property of appellee, and therefore their value ought to have been allowed him in

36

the estimate of damages. We insist that this is erroneous. The term "fixtures" is defined by counsel for appellee to be "those articles which were chattels, but which, by being physically annexed or affixed to real estate, become a part of and necessary to the freehold, and the property of the owner of the land." With this definition as being the original signification of the term, we find no fault, or even at the present day as applied to all articles affixed to the realty, except for purposes of trade or manufactures.

But with things affixed to the realty for purposes of trade or manufactures, there is at the present day, under the most approved decisions, no such things as "fixtures."

The whole doctrine, as applied to erections for trading and manufacturing purposes, has been abolished; and now no erection can be imagined, no matter how large, how massive, or how firmly affixed to or imbedded in the soil, which will be deemed a fixture, provided that it is built solely and wholly for purposes of trade. The first question to be decided in such inquiries is, Was the erection intended and used wholly for purposes of trade, and entirely disconnected with any use of the land, or of anything issuing out of the land?

If so, the question of how it was affixed is wholly immaterial. As extreme as this position may seem at first blush, it is believed to be fully borne out by the authorities. The following cases announce the doctrine, that in order for anything affixed to the soil to become a fixture, it must be used on the soil for the purpose of enjoying the realty or some profit therefrom · _Buckley_ v. _Buckley_, 11 Barbour Reports, at bottom of p. 63; _Taylor_ v. _Townsend_, 8 Mass. 411; Smith's Leading Cases, vol. ii. p. 251.

Manure is a fixture upon a farm, though it cannot possibly be fastened to the soil, for the reason that it is used on the realty; thus showing that the fastening has nothing to do with it, but the purpose is everything. _Read_ v. _Read_, 6 Greenleaf's Rep. 222; _Daniel_ v. _Daniel_, 21 Pick. 367; _Middlebrook_ v. _Middlebrook_, 15 Wendel, 169.

Manure is not a fixture in a livery stable, because it is not

used there to benefit the soil. *Needham* v. *Allison*, 4 Foster, 355.

A cider mill imbedded in the ground may be removed by an outgoing tenant who had erected and used it for the purposes of trade, and if at the expiration of his lease he go off without it, he may return after the lease has expired, and take it away. *Holmes* v. *Tremper*, 20 Johnson's Rep. 28.

A member of a nursery firm, who, by permission of the owner, had planted his trees on land of another, was permitted to dig up and carry off his trees, against a purchaser of the land, who had bought it at a mortgage sale. 7 Barbour's Rep. 264.

A still affixed to a house not a fixture. *Terry* v. *Robins*, 5 Smedes & Mars. 291.

But the strongest case of all is a decision by the Supreme Court of the United States, and we think it fully warrants the doctrine we have announced above on this point.

A tenant in Washington City erected upon a demised lot a two-story frame building, with a brick chimney which was imbedded in the ground. The building was partially occupied by him as a carpenter shop, partially as a dairy, from which he sold butter and milk, and the remainder of the house was occupied by himself and family as a residence. He was permitted at the expiration of his lease to carry off the house; the court taking the position that in deciding whether the house was a fixture or not, it made no difference what the size of the house was, nor what the materials were of which it was composed, nor whether it was let into the ground or not, nor whether it had a brick chimney or not, *the sole test being whether it was used for purposes of trade or not.* *Van Ness* v. *Packard*, 2 Peters, 137.

It is difficult to conceive a stronger case. And yet this very case is referred to approvingly by this court in *Stillman* v. *Hamer*, 7 Howard's Miss. Reports, p. 421 — a case which is relied upon by counsel for appellee, and to which we will presently revert.

We presume that no question will be raised as to the position that the road-bed and iron, which is the subject-matter of this

controversy, was laid down for purposes of trade alone, and was wholly disconnected with and foreign to any use that was intended to be made of the land, except as a foundation upon which to rest the road.   In addition, the fostering and encouragement of railroads has been the chosen and favorite policy of the State for many years, as evidenced in a hundred acts of legislation.   Indeed, it would be difficult to recollect anything which the railroads of the State have ever asked, that the legislature has hesitated to grant.   Inasmuch, therefore, as the doctrine that nothing should be regarded as a fixture against the interests of commerce, has grown up in the courts without positive legislation, because it was supposed to be for the interest of the State that trade should be encouraged, how much stronger becomes the argument when invoked in behalf of the State's chosen and favorite child.

But, say counsel for appellee, the liberal doctrine of law with regard to fixtures, as applied ordinarily to traders, cannot be claimed by us, because we were naked trespassers; and in behalf of trespassers the doctrine does not apply.   Whence do they derive this idea?   In support of it they cite 7 Howard's Miss. Rep. 421; 16 Mass. Rep. 449; 4 Metcalf, 306; and 2 Smith's Leading Cases, 248.   These authorities give no countenance whatever to the position; in fact, do not bear upon it at all.   In only one of the cases did the erections fall within the description of those which a trader or manufacturer could have claimed as intended for purposes of trade.   In all the others the articles claimed as fixtures had been affixed to the soil for purposes of agriculture or as residences, and under no circumstances could have been claimed as exempt from the old common-law doctrine of fixtures.   In 4 Metcalf alone, the articles were such as might have been claimed as having been erected for purposes of trade, to wit: a steam engine; but it had been erected, not by a trespasser, but by the true owner, who had mortgaged his land, and the contest was between him and the mortgagee.   The court held that the owner having made a conditional sale or mortgage of his own land, that anything which

he himself had affixed to the soil must go with it. There was no question of trespass involved.

The doctrine being then thus destitute of authority (so far as we can find), how does it stand upon principle? How can the manner in which a party enters upon the land of another change the character of the property that he carries with him? If he goes in as tenant, he carries with him and brings away personal property. If he goes in as trespasser, he takes with him as personal property that which immediately becomes realty and can never be removed. So to hold, would be in effect for a civil court to confiscate the personal property of a party, as a punishment for trespass. Is such a doctrine consistent with equity and common sense?

But, admitting that the entry of the Company upon Devaney's lands can be justified upon none of the grounds upon which we have defended it, what is the result? They are trespassers, say counsel. Yes, legal trespassers, we admit, just as every man is a trespasser who enters without permission upon the lands of another without authority of law.

But how do they differ from a purchaser at a void tax sale, or from a purchaser at a sheriff's sale, where the defendant in execution never was served with process, or from a party who buys from a man who had no authority to sell? Counsel say that our first condemnation of Devaney's land was without authority, and therefore void, and hence we had no title, and were mere naked trespassers.

So in all the cases instanced above, the titles by which the parties entered were void, and conveyed no legal right; and yet in such cases parties have been uniformly held to have gone in *under color of title.*

So we say that even if the condemnation was illegal, we yet went in under color of title, and are entitled to claim our "valuable improvements" which were erected for no purpose connected with the land, but purely for purposes of trade, and which therefore never became fixtures.

The authorities given below show conclusively, that though the title by which a party holds land be void, yet he may claim

to hold under color of title. Such, we contend, is the rule as applicable to the case at bar, even if the condemnation was void. The jury of review were by the charter created a court for the purpose of trying the case between Devaney and the railroad company, and the judgment rendered by them could not be more void than the judgment of the Circuit Court, where the defendant had never been served with process. *Hanna* v. *Ren-froe*, 3 George (Miss.), 128; *La Trombois* v. *Jackson*, 8 Cowen (N. Y.), 589; *Hill* v. *Wilton*, 2 Murphy, Law and Equity, North Carolina Rep. 14; 2 Carnes' Rep. 183; 13 Johnson, 118; 2 Cowen, 276; 9 Cowen, 530.

The above cases all decide that parties who enter upon land under void titles may avail themselves of statutes of limitations which only run in favor of those entering with color of title.

Counsel say a different rule has been established by case of *Memphis and Charleston Railroad* v. *Payne*, 8 George, 700.

We do not so conceive, for two reasons:

1st. That case only decides that the Memphis and Charleston Railroad Company were trespassers — a position which we do not controvert. It does not decide that they did not go in under color of title. A party entering upon land under a colorable but defective title is a trespasser in law, and while the case only decides that an action of trespass would lie against the Company, it does not negative the idea that they went in under color of title.

2d. The case referred to was distinctly decided, as will be observed by a careful reading of it, upon the ground that there had been no condemnation and tender whatever, and not that the condemnation was illegal or defective, as in the case at bar. It does not decide what would have been the effect of a tender under a defective condemnation.

But counsel contend that even if we went in under color of title, we cannot claim our valuable improvements, because such a claim is only allowable as an offset against *mesne profits*.

We do not so understand the law. It is true that the statute prescribes how and in what manner the claim for valuable improvements may be made as an offset against rents, but we do

not think it is limited to such a case. The claim for valuable improvements, when made in good faith, is a meritorious and most important one, and cannot be defeated by a mere failure upon the part of plaintiff to demand rent. If so, the plaintiff might in every case, where it was his interest so to do, abandon his claim for rents, and thereby defeat defendant's claim for improvements, though the latter might be in excess of the former by many thousands of dollars.

Such a construction would be most unjust. The statute, as we conceive, only provides that plaintiff in ejectment may embrace in his declaration in ejectment a claim for *mesne profits* also, and in such a case provides how the valuable improvements may be offset against it; but that it does not limit the claim to such a case, is shown by all the subsequent provisions of the act, particularly by those sections pointing out the mode of proceeding, where the value of the improvements is in excess of the value of the rents.

To recapitulate: We deny that the power of connection was exhausted by one connection.

We contend that, within the meaning of the charter, the connection remains now the same as before the war.

We insist that the authority to take appellee's land was given us under the seventh and eighth sections of the charter, under the powers conferred for " repairs and maintenance."

If we be mistaken in all these positions, then we contend that our erections having been made solely for purposes of trade, they did not become fixtures.

We deny that erections made for trading purposes cannot be claimed by a trespasser.

We insist that if all our proceedings under the first jury were unauthorized, still we went in under color of title, and are not wilful and wrongful trespassers.

If we are right in any one of these positions, grave errors were committed by the court below, and both cases must be reversed.

*Clapp, Vance, & Anderson* for plaintiffs in error.

Was the power of connecting with the Mississippi Central Railroad granted to the Mississippi and Tennessee Railroad by its charter exhausted by the connection made before the war; and was the connecting road, constructed in 1865 through Devaney's land, built without authority of law?

Whatever of strictness may have existed in the earlier cases, in restricting the power of corporations to the express grant of authority, such is not the case now; the powers granted to corporations being now construed like all other grants of power— not according to the letter, but the spirit and meaning. See *Union Bank* v. *Jacobs*, 6 Humph. p. 520. In Angell & Ames p. 192, § 12, the true rule is laid down in the following language:

"A corporation, having been created for a specific purpose, can not only make no contracts forbidden by its charter, which is, as it were, the law of its nature, but in general can make no contract which is not necessary, is thus directly or incidentally to make it to answer that purpose. In deciding, therefore, whether a corporation can make a particular contract, we are to consider, in the first place, whether its charter, or some statute binding upon it, *forbids* or *permits* to make such a contract; and if the charter and valid statutory law are silent upon the subject, in the second place, whether the power to make such contract may not be *implied* on the part of the corporation as directly or incidentally necessary to enable it to fulfil the purpose of its existence, or whether the contract is entirely foreign to that purpose."

"The creation of a corporation for a specific purpose implies a power to use the necessary and usual means to effectuate that purpose." Angell & Ames on Corp. 200, § 3.

As to what are necessary and proper means, see *McCulloch* v. *State of Maryland*, 4 Wheaton, 413: "Let the end be legitimate, let it be within the scope of the constitution [in this case, charter], and all the means which are *appropriate*, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the constitution [charter], are constitutional," etc.

Mr. Story says: "If the means are usual and appropriate, the implication of power arises." Story on Bills, 95.

The end or object of the incorporation of the Mississippi and Tennessee Railroad is to carry passengers and freight from the line of the State of Tennessee, in the direction of Memphis, to some point on the line of the Mississippi Central Railroad.

Appellee contends that that point has been elected by the corporation, and that point is the depot at Grenada; and they have selected a line of road making that connection different from the one now proceeded on. Admitting this to be so, the destruction of a bridge across a river—the Yallobusha—whether an incident of the war or an accident, prevented the corporation from performing the end of its incorporation—the carrying of passengers from Memphis or State line to Grenada, the point of connection with the Mississippi Central Railroad elected. The court knows judicially, whether the bill of exceptions shows it or not, that this is one of the navigable rivers of the State, declared so by its laws, and therefore the bridge must necessarily be an important and costly structure. Was the Company compelled, in order to fulfil the purpose of their incorporation, to incur the great *expense* and *delay* of rebuilding the bridge, when they could accomplish the object at a small expense and with little delay, by constructing a branch road, such as was constructed?

The point of connection of the two roads elected is not *changed*—it is only the means of reaching that point which is changed. The point of connection is still the depot at Grenada, but for a mile the transportation is over one track and over one bridge, instead of over two tracks and over two bridges; surely the means "is appropriate, and plainly adapted to the end of the incorporation"—the transportation of passengers and freight to Grenada. If so, and if not inhibited by provisions of the charter and statutory law, the change is legal, as being fully authorized by the act of incorporation, according to the authorities cited.

Suppose a few hundred yards of the track of this railroad should prove a quagmire, and sink into the earth past repair;

must the Company suspend their business until they can get an amendment of their charter, because they elected that *particular line;* or would they, under the implied authority of exercising every power necessary or reasonably proper to carry out their express powers under the charter, be authorized to make a deviation that would enable them to avoid the quagmire?

"It has been held, that a grant to a railway company to construct their road between two towns, gave them implied authority to construct a branch to communicate with a depot and turn-table on a street in one of the towns (New Orleans) off the direct line." Redfield on Railways, p. 192. See *Knight* v. *Carrolton Railway,* 9 Louisiana Ann. 284; *N. O. H. Railway* v. *Second Municipality, New Orleans,* 1 Louisiana Ann. 128.

In the case of *South Carolina Railway* v. *Blake,* 9 Richardson, 229, it is held that a railway company have the same power to acquire land, either by grant or compulsory proceedings, for the purpose of varying, altering, and repairing their road, as for the original purpose of locating and constructing it. See 2 Rich. 434, *Ex parte S. C. Railway.*

It is true there are weighty authorities to the contrary, but it seems to us that the decisions quoted are most accordant with reason, justice, and the commercial spirit of the age.

Another ground of defence is, that although the first jury assessed damages a few weeks before an amendment to the charter authorizing the branch connection was obtained, the evidence shows that the branch was not located, and no work was done on it until *after* the amendment was passed; and the case was tried *de novo* in the Circuit Court, taken there by appeal of Devaney, and adjudicated there on the evidence exhibited by both parties, and the amount of damages. ($300) found by the jury was tendered to Devaney by the railroad company.

This he refused to receive, because the railroad company did not tender him the value of their own property, cross-ties, iron, etc., they put on the land of Devaney.

The objection of Devaney is merely technical, and he had all the advantages he could have had in case the first jury had been legally organized.

The trial was *de novo*, and on the merits; and the real damage done his land, according to the estimate of the jury, was tendered him; and the jury which returned the verdict was legally organized, being organized subsequent to the amendment of the charter.

*Walthall & Golladay* for defendant in error.

The charter of the Mississippi and Tennessee Railroad Company (Acts, October, 1852, p. 30) vests that corporation with authority to construct a railroad, "commencing on the northern boundary line of this State, at such point as may be deemed most eligible by the corporation, and run through such portions of the counties of De Soto, Panola, Yallobusha, and Tallahatchie, and connect with the Mississippi Central Railroad *at such points as they may elect.*" It also makes provisions for "such railroad way, or privilege, to be fifty feet wide on both sides, from the centre of the track of the railroad." § 2 of the charter.

The President and Directors of the company are "vested with all the rights, privileges, and powers requisite and necessary for the construction, repair, and maintenance of a railroad, to be located as aforesaid" (§ 7). And the corporation has authority to cause "examinations and surveys to be made on the ground before indicated," and to enter upon and take possession of such earth and materials "as may be necessary for the construction or repair of said railroad and the requisite erections," etc.

The proof shows that the corporation made its election of a route, and of a point of intersection with the Mississippi Central Railroad, south of Yallobusha river, in the town of Grenada, and located its route, constructed its road, and used it from June, 1861, until June, 1863. Afterwards, for reasons in which the defendant in error had no interest, the corporation, without any enlargement of its powers by law, saw proper to make a material change in its route, and to this end had a jury summoned to assess the damages which would result to defendant in error from the construction, upon his land, of a branch

line of railroad, five-eighths of a mile in length, to run across from the original road of plaintiff in error, to the Mississippi Central road, more than a mile distant from the point of intersection adopted in the first instance, and entirely without the fifty feet to which the corporation's privilege was limited by the charter. The damages assessed by the jury were tendered to defendant in error, and by him declined.

Afterwards, on the 21st day of November, 1865, the charter of plaintiff in error was amended so as to allow its road to intersect the Mississippi Central Railroad at a point north of Yallobusha river (Session Acts, p. 290); and plaintiff in error, without having the condemnation of land and materials provided for by the charter, and without the consent of defendant in error, but against his will, proceeded to construct the branch line, above referred to, upon his land, of which he was known by plaintiff in error to be the owner, and of which he was then in possession. In the construction of this line, cross-ties and iron rails were imbedded into, and firmly and securely affixed to the soil. *After it had been completed,* a jury was summoned, at the instance of the corporation, to condemn the land; and on appeal from its decision to the Circuit Court of Yallobusha county, it was decided by that court that, in estimating the damages of defendant in error, it was proper to take into account the value of the cross-ties and rails that had been affixed and annexed to his land.

We insist:

1. Plaintiff in error being a corporation, derives all its powers and all its rights from its charter, and has none not thereby conferred, except such as are incidental to its existence. It is "strictly limited to those powers which are specially conferred upon it. The exercise of the corporate franchise being restrictive of individual rights, cannot be extended beyond the letter and spirit of the act of incorporation." It must show *a grant* for all the powers it attempts to exercise. Bacon's Abridgment, "Corporations" (D); 4 Peters, 152; 11 Peters,

546; 4 Hill's N. Y. Rep. 76; ib. 92; 3 Johnson's Cases, 107, and cases cited in note (a), pp. 108–9.

The power to take private property *in invitum* conferred by legislative grant upon a railroad company, is, in England, required to be exercised in strict conformity to its charter, and the general law defining the powers of such corporations. And in this country the company must show the express warrant of the legislature, given within constitutional limits. See Red-field on Railways, § 64, and many cases cited in notes to the third edition, vol. i. p. 233 *et seq.*

The charter of plaintiff in error gave it authority to elect its route and point of intersection with the Mississippi Central Railroad. It conferred upon it no authority to recede from its decision, when once made; particularly when that decision had been published and acted on by condemning private property on the route selected, and building its road thereon and using it for two years. When the election was made and the road constructed, the power of the corporation, in that regard, was spent and exhausted. *Its action was conclusive, and its election irrevocable.* Bacon's Abridgment, "Election" (D); Co. Litt. 145, *a*; Com. Digest., "Election," chap. 2.

For the application of the principle, that an election, when once made, is irrevocable in cases analogous to this, see American Railway Cases, 581; *Griffin* v. *House*, 18 Johnson, 397; *State of Conn.* v. *Norwalk and Danbury Turnpike Company*, 10 Conn. Rep. 157–163; *Turnpike Company* v. *Hosmer*, 12 Conn. Rep. 360; *Louisville & Nashville Branch Turnpike Company* v. *Nashville & Kentucky Turnpike Company*, 2 Swan, 282; 2 Ohio State Rep. 235; 17 ib. 340; *Blakemore* v. *Glamorganshire Canal Company*, 1 Mylne & Keen, 154.

Two cases from South Carolina, reported in 2 Rich. 434, and 9 ib. 229, seem to hold a different doctrine. There is no provision in the constitution of that State which forbids private property to be taken for public use without compensation, and it has been decided there that it can be so taken,— see *State* v. *Dawson*, 3 Hill's Rep. 100,— a decision which, in the language

of a distinguished author, "is certainly at war with the generally received notions on that subject since the period of the Roman Empire." The anomalous rulings in the cases in 2 and 9 Rich. must be attributed to the *peculiar* views of South Carolina, that private property may be lawfully taken for public use without compensation. They certainly find no support in reason, or in the decision of any other courts, either English or American, and ought not, we submit, to be received as authority in a State with a constitution like ours.

In England, "notice to treat," or "notice of location," to a land-owner, of the *intention* to appropriate his land, has been held to give him the right to recover its value from the company, even though the road is not located on it. *Rex* v. *Hungerford Market Company*, 4 Barnwell & Adolphus, 327; *Doe* v. *London and Croydon Company*, 1 English Railway Cases, 257; ib. 375; 4 ib. 615 and 489.

And the rule seems not to be different in this country. *Harrington* v. *County Commissioners of Berkshire*, 22 Pickering, 262; *Westbrook* v. *North*, 2 Greenl. 179; *Hampton* v. *Coffin*, 4 New Hampshire Rep. 517.

The amendment to charter of plaintiff in error, passed in November, 1865, can have no effect on the rights of defendant in error, as no condemnation of the latter's land was had thereunder before the construction of the branch road. The legislature did not intend, by this amendment, to authorize the railroad company to seize private property, to enable them to make the proposed deviation in their line, without proceedings regularly had for its condemnation. And if such had been their purpose, that they had no power to accomplish it, will not be disputed. See 8 George, 172; *Penrice* v. *Wallis*, ib. 700; *M. & C. Railroad Company* v. *Payne*.

2. The cross-ties and iron, when annexed to the land of defendant in error, by plaintiff in error, became fixtures, *and the property of defendant in error*, the owner of the soil; and plaintiff in error, having *committed a trespass* in putting them there, *has no right of removal*.

The term "fixtures" denotes those articles which were chat-

tels, but which, by being physically annexed or affixed to real estate, become a part of, and necessary to, the freehold, and the property of the owner of the land.

The general rule is, that " everything that is fixed to the realty is part of the realty." The right to the thing must either be adjudged to the owner of the soil, or the right to the soil to the owner of the thing; and as land is more durable and substantial, the property in the thing must accede to that in the land. But it has been found necessary to relax the strict rule of the common law, under certain circumstances, and the *right of removal*, when certain relations subsist between the parties, has been long recognized, not as an exception to the rule, but as an established innovation upon the common law. Hill on Fixtures, §§ 1 and 2.

Thus between landlord and tenant there has been a relaxation in favor of the tenant, as there has been in favor of a tenant for life against the remainderman. But in the various rulings that have been made upon this subject, by courts both English and American, there has been no disposition manifested by any of them to give to *mere intruders* the benefit of the liberal rules established in favor of more deserving parties. They cannot bring themselves within the reason or policy of these relaxations, and whenever the question has been presented, it has been held that, as between the owner of the freehold and one who is a mere intruder or trespasser, the rigid doctrine of the common law *is still in force. Stillman* v. *Hamer*, 7 How. Miss. 421; *Washburn* v. *Sproot*, 16 Mass. 499; 4 Metcalf, 306; 2 Smith's Leading Cases (*notes to Elwes* v. *Mawe*), p. 248.

In a case before the House of Lords (*Ramsden* v. *Dyson*, 12 Jur. N. S. p. 506, cited in 1 Redfield on Railways, p. 220), it was ruled: " If a stranger build upon the lands of ' A,' supposing them to be his own, and ' A' wilfully remains passive, equity will not allow him to profit by the mistake : but if the stranger *knows* that the land upon which he is building belongs to ' A,' then ' A ' may assert his legal rights, and take the benefit of the expenditure."

Language to the same effect is employed by Judge Clayton, in the case in 7 Howard, above referred to. Indeed, such seems to be universally recognized as the true rule.

The road-bed and rails fastened on it are real property. 25 Barbour, 484.

*W. & J. R. Yerger* for defendant in error.

I. Pierce, in his work on railroad law, speaking of the power of a railroad corporation to change its location, says:

" The power of the company to determine its location, when once exercised, is exhausted. It may have a discretion as to the selection of its intermediate points, or its route between certain fixed points ; but having exercised the discretion, the location cannot be changed without legislative authority." Pierce's Railroad Law, 218, and authorities cited.

These authorities clearly establish the fact, that, at the time the railroad first sought to change their location, prior to the passage of the amended Act of 1865, they had no power or authority to make such a change. The jury which was assembled by their action, assembled without an authority in law for their act. The damage assessed by them was assessed without authority, and a tender made to the defendant of the amount of damage thus assessed gave no right or authority whatsoever to plaintiff in error, to enter upon defendant's land, and to construct thereon their railroad track.

All the acts of this jury were *coram non judice,* and the defendant no more affected by an estimate of damage fixed by them, than he is by the estimate of any other unauthorized body of men.

Plaintiff in error seems upon reflection to have become well convinced of this ; hence their procurement of the amendment to their charter, and the call made for the subsequent jury, from whose verdict they have taken this appeal.

II. Thus we see that there was no power in the railroad to change its location, until after the passage by the legislature of the amendment to the charter; and that all the acts of the road upon that subject prior to the passage of the same were *void.*

The next question for us to examine, then, is, How was the power thus conferred upon the road to make the change to be exercised? We answer, only in a manner conformable to law, and with proper regard to the rights of other parties to be affected by the change.

The original charter clearly designates the manner in which defendant's title could be divested, and the road possessed of the same: a jury is first to be summoned, to assess the amount of damage to be sustained; *then* "the jury shall reduce their inquisition to writing, and shall sign and seal the same; and such valuation, when *paid* or *tendered* to the owner, . . . shall entitle said company to the land." Acts (called Session), 1852, § 8, pp. 9, 34, 35.

The grant of the power to take the land of the citizen for the use of the corporation, is in derogation of common right, and is strictly construed. On this subject the Master of the Rolls, in *Gray* v. *Liverpool, etc., Railway*, quoted in Redfield on Railroads, p. 116, says:

"In these cases it is always to be borne in mind, that the acts of Parliament are acts of sovereign and imperial power, operating in the most harsh shape in which that power can be applied in civil matters, solicited as they are by individuals, for the purpose of private speculation and individual benefit." To the same effect is the language of Chief-Justice Taney in *Charles River Bridge* v. *Warren Bridge*, 11 Peters, 420.

From an examination of numerous cases on this subject we reach the conclusion, that before the road had any authority to enter upon defendant's land, and attach and fasten to his soil their road-bed, it was a condition precedent, that a jury should be summoned, and a payment or tender of payment made to defendant of the amount of money assessed as damage by this jury. In Redfield on Railways, p. 119, §. 65, numerous cases are cited in which language similar to that used in the charter of the road in this case has received the construction of the courts, and the conclusion reached is, "that no title vests until such payment."

The case of *Stacy* v. *Vermont Central Railway*, 27 Vt. Rep.

37

39, is there particularly cited. In that case the court says, "They must pay or deposit the money before any such right accrues." "The payment or deposit of the money awarded is a condition precedent to the right of the company to enter upon the land for the purposes of construction; and without compliance with it, they may be enjoined by a court of equity, or prosecuted in trespass at law for so doing. The right of the land-owner to the damages awarded is a correlative right to that of the company to the land. If the company has no vested right to the land, the land-owner has none to the price to be paid." See also on this point, Redfield, pp. 9, 47, § 73, and cases cited.

But even without this clause in the original act of incorporation, which our legislature seems to have placed there through over abundance of caution, "In Mississippi it is required, by the constitution of the State, that the compensation be paid before the right to use the land is vested." Redfield, pp. 9, 151, § 73; *Stewart* v. *Raymond Railway*, 7 S. & M. 568; *Thompson* v. *Grand Gulf R. R.*, 3 How. (Miss.) 240; *Penrice* v. *Wallis*, 8 George, 172; *M. & C. R. R. Co.* v. *Payne*, 8 George, 700.

All the acts of the railroad, therefore, in this matter have been in total disregard of the provisions of their charter, the fundamental law of Mississippi, and the rights of the defendant.

Without availing themselves of the right to summon a jury to assess the damage, which they might do, and in opposition to the expressed wishes of defendant, they entered upon his land. When they entered upon it, the defendant had title to the same. He has title to the same to-day, and his title will continue until divested by "payment," or "tender of payment," of the amount of damage assessed by the jury.

But the reply may be, that a jury has been summoned in this case, and all that the law requires of plaintiff has been done. What jury is referred to? is it the jury that assembled prior to the amendment to their charter? That jury assembled without any authority in law, and all their acts were void. Is it the second jury that assembled after the completion of the work, when the road-bed had been finished, and annexed to defend-

ant's soil? Has the defendant availed himself of the judgment of that jury, and paid or tendered the amount of their assessment? When he does that, we admit that he will have title to the land; but, until that is done, the plaintiff in error is a trespasser upon the rights of another. Is he excusable for entering upon this land, and remaining upon the same, because "a disagreement" has arisen in the present case? It was to avoid just such "disagreements" — to avoid the unequal contest which exists in a suit for damage brought by a private person against a wealthy corporation, and because it is "an act of sovereign and imperial power, operating in the most harsh shape" under any circumstances, to take by force of law the property of one citizen and bestow it upon another — that our constitution and State laws require a payment of the damage resulting from the same to be made in advance.

Be the assessment of damage made by the jury in this case, too great or too little, has no bearing upon this branch of the case; a "disagreement" as to this estimate certainly exists between the parties, and can only be settled by a strict compliance with all the pre-requisites of law; and the plaintiff is and will remain a trespasser until this is done.

III. It is a very clear rule of law, that when a party enters upon the land of another, and in opposition to his expressed wishes upon the subject, he is a trespasser. And in this case, when, after the passage of the Amendment of 1865, plaintiffs entered upon the land of defendant, they entered upon it and built their road upon it *before they had divested defendant of his title.* They were naked trespassers; and when the jury came to estimate the damage, they were fully justified in considering, as the property of the defendant, all such fixtures as were annexed to defendant's soil by the trespass of plaintiffs.

The common-law doctrine is well established, that the term "fixtures" is applied to "articles of a personal nature, which have been affixed to the land." Amos and Ferard on Fix. 1.

Again: "It is a maxim of law, of great antiquity, that whatever is fixed to the realty is thereby made a part of the realty to which it adheres, and partakes of all its incidents and prop-

erties; by the mere act of annexation, a personal chattel immediately becomes part and parcel of the freehold itself." Amos and Ferard, Fix. p. 9.

Again, the same writers say: "Now every case in which there is a right of severing a thing from the freehold by virtue of the law of fixtures, is considered as an *exception* from this general rule;" and again, "in order to constitute a fixture, that the article in question should be let into or united to the land, or to some substance previously connected with the land." Amos and Ferard, Fix. 3.

In a case cited in Gibbons on Fixtures, 8, p. 16, Dallas, C.J., says, "Whether a particular thing be a fixture or not, is a mixed question of law and fact."

Actual annexation, however, is not absolutely necessary in all cases to constitute an article a fixture — as in the case of *Snedeker* v. *Warren*, 2 Kernan (N.Y.), 170, where a colossal statue, which rested upon its pedestal, and was held there by the mere force of gravity, was held to be a fixture. The court in that case says: "If the statue had been actually affixed to the base by cement or clamps, or in any other manner, it would be conceded to be a fixture and to belong to the realty. But, as it was, it could have been removed without fracture to the base on which it rested. But is that circumstance controlling? A building of wood, weighing even less than this statue, but resting on a substantial foundation of masonry, would have belonged to the realty; a thing may be as firmly affixed to the realty by gravitation as by clamps;" "and its connection with the land is looked at principally for the purpose of ascertaining whether that intent was, that the thing in question should retain its original chattel character, or whether it was designed to make a permanent accession to the lands." *Snedeker* v. *Warren*, 2 Kernan, 170.

In the case of *The Congregational Society of Dubuque* v. *Fleming*, xi. 533, cited in Iowa Digest, vol. ii. p. 436, it is stated that, "While a bell belonging to a religious society, if left upon the ground or placed in the building without use, might in no sense be so far of the realty as to be exempt from execution as a

part thereof; yet, where it was placed in a frame on the church lot, and used, it was held exempt, though the posts of the frame were not let into the ground. The placing it in this position, and the use, indicated unmistakably the intention of the society to affix it to the realty, to render it a permanent accession to the land, to appropriate to the purpose designed, and to divest it of its original chattel character; and though it be admitted that the mere intent to thus convert it, without some act, would not be sufficient, yet the act and use indicated the intention, and have the effect of changing the character." 2 Iowa Digest, 436.

The proof in the case is, that the plaintiff "constructed" and "affixed" a "railroad track" to the land of defendant in error, and "there embedded cross-ties into the soil, and nailed and otherwise screwed and fastened thereto and thereon iron rails or bars known as railroad iron," and the same were there remaining, so constructed, annexed, and affixed when the jury found their verdict.

In every aspect of the case, the railroad track was a fixture to defendant's soil; the jury so found it. Its cross-ties were "imbedded" in the soil, and the iron bars "nailed, screwed, and fastened" thereto. It had every quality of annexation.

If the cross-ties had not been imbedded, it was still a fixture, like the case of the bell, or the statue, or the fence. Had the cross-ties and iron rails been only loosely thrown upon the land, or piled in heaps upon the same, they would have retained their chattel character; but placed in the manner that they were placed, fastened and laid down, and used on a "railroad track," the intention and the use clearly indicate that they were so expressly laid and placed there, for *permanent* use and occupation.

That the ancient rule of law on the subject of fixtures was harsh and rigorous, we do not deny; and it was a wise action on the part of the courts to modify its rigor, where a different rule of law applied.

Exceptions have at various times been engrafted upon the rule — *First*, in favor of tenants; *then* in favor of the remov-

al of articles put for *trading* and *manufacturing* purposes; and then in the matter of domestic furniture and ornament. See Introduction to A. &. F. on Fixtures.

Speaking of the exceptions made for the purposes of trade, the Supreme Court of the U. S., in the case of *Vanness* v. *Packard*, 2 Peters, 137, says : " Upon principle of public policy, and to encourage trade and manufactures, fixtures which were erected to carry on such business were allowed to be removed by the tenant during his term.

Modern authority seems to divide fixtures into two classes — " movable " and " irremovable." The owner of a " movable fixture " can remove the same, or maintain his action of " trover " for the same.    The " irremovable fixture " becomes a part and parcel of the realty, and goes with it, following every disposition which is made of the same ; and the solution of the question as to which class a fixture belongs, is determined in a great degree by the relative situation of the parties.    In favor of a tenant, the right to remove a fixture is construed with great liberality ; with stringency against a grantor; and still greater stringency against a mere tresspasser.    Thus, in the case of a tenant who had erected a building of considerable size, upon land which he had rented for the purpose of exercising his trade as a manufacturer, the Supreme Court of the United States permitted its removal.    *Vanness* v. *Packard*, 2 Peters, 137.    But in the case of *Snedecker* v. *Warring*, 2 Kernan, 170, as against a grantor of land, it was decided that a colossal statue of Washington was a fixture which could not be removed. The court held that " property accrues from the fraud and folly of another : as where people, with an evil intent, or through ignorance, build with their own timber on another's soil."    " In such cases, what is built, planted, and sown shall be the owner's of the soil, upon presumption that they were given to him."

In the case of *Stillman* v. *Hamer*, cited above, in speaking of modifications which had been engrafted upon this general rule, as in the case of tenants, etc., this court says : " It is useless to enter upon a critical examination of the cases upon this sub-

ject, because they relate to controversies between persons. standing in a different attitude from those before us in this instance. The modifications of the rule seem to have been admitted from time to time, from the force and pressure of peculiar circumstances." 7 Howard's Miss. Rep. 421.

The attitude of the parties before the court in that case, and the attitude of the parties in this case, the court, on examination, will find to be identical — both parties were wrongfully on the land of others.

In Gibbons on Fixtures, p. 4, the same general principle of law is laid down as above stated, namely, that "where one man fixes a chattel on the land of another, such act is, in legal effect, a gift of the chattel to the land-owner."

SHACKELFORD, C.J., delivered the opinion of the court.

The first case, No. 11057, is an action of ejectment; the second, an appeal from the verdict of a "jury of review," to condemn and assess damages for the right of way for a road-bed of five-eighths of a mile, from the line of the old road-bed of the Mississippi and Tennessee Railroad Company, to connect with the track of the Mississippi Central Railroad Company, on the north side of the Yallobusha river.

The same questions are involved in both cases, and by desire of counsel they will be decided together.

The jury in the ejectment case found a verdict for the defendant in error, and judgment was rendered upon it.

In case No. 11058, they found a verdict for $3600, in favor of the defendant in error.

A motion for a new trial was made in each case, assigning the same grounds in each case.

1st. Because the court erred in giving plaintiffs charge No. 2.

2d. For error in the court in refusing defendant's charges.

3d. Because the jury found contrary to law and evidence.

During the progress of the trials, exceptions were taken to the rulings of the court in granting the instructions asked by defendant in error, and to the action of the court in refusing those of the plaintiff in error.

These rulings of the court are made grounds of error in this court.

All the testimony (an agreed state of facts), is also embraced in the bill of exceptions taken to the rulings of the court in refusing new trials.

Which testimony, or agreed state of facts, is, in substance, that the Mississippi and Tennessee Railroad Company was chartered by an act of the Legislature of the State of Mississippi, on the 16th day of October, 1852, and by the terms of its charter authorized to construct a railroad from some point on the northern boundary line of the State through certain counties, " and to connect with the Mississippi Central Railroad at such point as they may elect."

The Company were empowered by their charter to enter upon and condemn land of private parties for the purpose of procuring the right of way, when the same could not be obtained by consent of the land-owners, and the manner of obtaining such condemnation, by jury of review, was prescribed.

The Company selected the town of Grenada, being immediately upon the south bank of the Yallobusha river. A bridge across said river was erected, a few hundred yards from a similar structure belonging to and used by the Mississippi Central Railroad Company.

The road-bed, and bridge thus erected, were continually used from the completion thereof until the month of June, 1863 (having been used for two years), when the bridge of the Mississippi and Tennessee Railroad and the Mississippi Central Railroad were both burned by military forces.

After the close of the late civil war, both companies being in embarrassed circumstances, occasioned by the loss of their bridges and their rolling stock, etc., they resolved to build a joint bridge, or partnership bridge, over the Yallobusha river at Grenada, upon the piers of the Mississippi Central Railroad Company, with the permission from said Mississippi Central Railroad Company to the Mississippi and Tennessee Railroad Company to run their cars over the track of the Mississippi Central road, a few hundred yards north of the Yallobusha river,

for the purpose of crossing the river upon said partnership bridge.

To effect this object, it became necessary for the Mississippi and Tennessee Railroad Company to *deflect* from their former track on the north side of the Yallobusha river, and to have the right of way to build a new track about five-eighths of a mile, to enable them to connect their rails with those of the Mississippi Central Railroad.

Jenkins Devaney, the defendant in error in the case before us, is the owner of the land lying between the two roads through which the Mississippi and Tennessee Railroad Company proposed to build their new or connecting track.

Devaney and the plaintiff in error could not agree upon the price for the land upon which the road-bed for the track had to be constructed. Consequently the Mississippi and Tennessee Company, upon the 11th day of November, A. D. 1865, in the mode pointed out by their charter, caused a jury of review to be summoned; who, after inspection of the land surveyed for the new track, condemned the same to the use of the Company, and assessed the damages to be paid to Devaney therefor at three hundred dollars.

This amount the Mississippi and Tennessee Railroad Company, on the 14th of November, 1865, tendered to the said Jenkins Devaney, who refused to receive the same; proof of the tender to Devaney appearing in the record.

No further action was taken at that time by the Mississippi and Tennessee Railroad Company.

On the 21st of November, 1865, the legislature of this State passed an act amendatory of the charter of the plaintiff in error, whereby they were specially authorized to make a connection with the Mississippi Central Railroad Company, on the north side of the Yallobusha river.

A few days after the passage of said amendatory act, without any new survey, or jury of review, or condemnation, the company entered upon the land originally surveyed, and condemned by the jury of review on the 11th day of November,

A. D. 1865, and for which they had tendered to the defendant in error the *three hundred dollars.*

On the 13th day of April, 1867, the defendant in error instituted, in the Circuit Court of Yallobusha county, an action of ejectment against the Mississippi and Tennessee Railroad Company, for the recovery of the land surveyed and condemned by the said jury of review on the 11th day of November, 1865, and upon which said Company had in the mean time placed their road-bed, ties, and iron rails, and upon which the cars of the plaintiff in error were then running.

Shortly after the commencement of the ejectment suit, on the 26th of April, 1867, the Mississippi and Tennessee Railroad Company had another jury of review summoned, who inspected and condemned the same land inspected and condemned by the jury of review of the 11th of November, 1865, and rendered a special verdict, assessing the damages sustained by Devaney at the same sum which the former jury assessed — to wit, $300.

They state in their verdict, in addition, that they make this assessment under the impression that Devaney is not entitled to claim as damages the value of the road-bed, cross-ties, and iron rails, which the Company had laid down upon the land in question nearly two years before, and which the Company were then using. "But if Devaney is entitled to claim said road-bed, cross-ties, and iron rails as his property, that then they assess his damages at $3600 — namely, $300 for *actual damages sustained,* and $3300 for the value of the road-bed, cross-ties, and iron rails."

From this verdict of the last jury of review Devaney appealed to the Circuit Court of Yallobusha county, and on the trial of this appeal the verdict of $3600 was rendered by the jury.

Upon the trial of the suit for damages the railroad company pleaded and relied upon the verdict of the "jury of review" of the 11th of November, 1865, and the condemnation of the land by the same, and upon the tender of the $300 assessed by said jury on the 14th day of November, 1865.

The railroad company, by their counsel, asked the court to charge the jury, "that, in estimating the damage sustained by

Devaney, they could not estimate as part of his damage the value of, the cross-ties, iron rails, and superstructure which has been placed upon the road-bed on said land by said company."

This instruction the court refused to give. Exception was taken to this ruling of the court, and allowed.

At the instance of the defendant in error, the court gave the following instruction to the jury: " That they, the jury, might consider the value of the cross-ties, road-bed, and iron rails, in estimating the amount of plaintiff's damage."

To the giving of this instruction plaintiff in error objected, and excepted at the time.

Upon the trial of the ejectment suit, as upon the trial of the suit for damages, the plaintiff in error pleaded and relied upon the tender of the amount assessed by the jury of review of the 11th of November, 1865, and upon their verdict of condemnation on the 11th of November, 1865, and upon the amended article of the legislature of the 21st of November, 1865, to their charter.

The railroad company, by their attorneys, asked the court to give the following instructions:

1. " That if the jury believe that before the railroad company entered upon the land they tendered. the amount of the verdict found, on the 11th day of November, 1865, to the plaintiff Devaney, they would find for the defendant."

2. " That if the jury believe that the defendant entered upon the land in November, 1865, and upon the 4th of September, 1867, tendered the plaintiff the amount found due on the 26th of April, 1867, they would find for the defendant."

3. " That if the jury believe that defendant entered upon the land under the charter and amended charter, and built their road, and were using it as a public railroad under said charter, they would find for the defendant."

All of which instructions were refused by the court, and exceptions were then taken to the ruling of the court.

The court then, at the request of the counsel for the plaintiff Devaney, charged the jury, "that if the railroad company relied for defence upon the fact that the land had been con-

demned by a jury impanelled to assess plaintiff's damages, under the provisions of defendant's charter, then they must prove payment or tender of the amount found due."

The verdict for $3600 had been rendered against plaintiff in error previous to the trial of this, the ejectment suit; it evidently referred to this verdict.

The plaintiff in error assigns the following grounds for error in both cases:

1. Error of the court below in giving charges asked for the plaintiff.

2. Error in the court's refusal to grant charges asked for the plaintiff.

3. Error in the court's refusal to grant charges asked by the defendant.

4. Error in the court in overruling motions for new trials.

The first question raised and presented by counsel in the argument of the case is this:

Whether the connection made with the track of the Mississippi Central Railroad north of the Yallobusha river is in violation of the charter of the Mississippi and Tennessee Railroad Company, or whether the power to connect with the Mississippi Central Railroad was exhausted by the connection at their depot in the town of Grenada, on the completion of their road in 1861.

It is contended by counsel for the defendant in error that the election by the plaintiff in error to locate their depot at Grenada, and their location of the same there, and their connection with said road at that point, exhausted their right, under their charter, to connect with the Mississippi Central road at any other point; consequently, that the connection last made by the plaintiff in error with the track of the Mississippi Central road north of the Yallobusha river, is illegal and void.

The depot of the Mississippi and Tennessee Railroad Company in Grenada is at the same place where it was originally located, on the completion of their road to that point.

There has been no effort to change the depot, as shown by the proof in the case; all the plaintiff in error attempted to do,

and did do, was to reach their depot in Grenada, the terminus of their road, by connecting the iron rails of their road with those of the Mississippi Central track north of the Yallobusha river; by doing this they accomplished their object.

They having sustained half the expense of erecting a bridge over said river, upon the piers of the Mississippi Central Railroad Company, they acquired a right to run their cars over said bridge, and over a few hundred yards of the track of the Mississippi Central road.

This connecting of the iron rails with those of the Mississippi Central road, as stated and shown by the diagram in the record, is not such a connection as was contemplated by the charter of the company; it is not the terminus of their road in a legal sense. There is no depot at the junction for the transfer of freight or passengers; their trains pass on and over the track of the Mississippi Central road without obstruction, to their depot at the terminus of their road in Grenada.

The proof shows, that before the late civil war the cars of the plaintiff in error entered their depot in Grenada *over their own road and bridge.*

Their charter authorizes them to connect with the Mississippi Central road at such point as they might select, *where their road should terminate.*

It will scarcely be denied, that the plaintiff in error had the right and the power, under their charter, to connect their rails with those of the Mississippi Central Railroad Company at any point above Grenada they saw proper, with the consent of the Mississippi Central Railroad Company, previous to the construction and completion of their bridge over the Yallobusha river, and of their road to their depot in Grenada, and to run their cars over the track of the Mississippi Central Railroad to their depot in Grenada.

If this position is correct, upon what ground can that right be controverted now?

Again, if the right of way had been purchased from the defendant in error, Devaney, over his land, as proposed by the plaintiff in error, and the connection made, as it has been done, without

opposition from Devaney, who could object to the running of their cars over their joint bridge and upon the track of the Mississippi Central road?

It is only necessary to ask the question to obtain its answer.

The position of track of the Mississippi Central road, over which the plaintiff in error run their cars to their depot in Grenada, for all practical purposes is as much their road or track as if they had originally owned and constructed it. They have unrestricted use of it in common with the Mississippi Central Railroad; they own the bridge in common, and their legal right to the use of it is equal in all respects with that of the Mississippi Central. It only loses its identity as their road at the connection with the track of the Mississippi Central Railroad, at the depot of the plaintiffs in error in Grenada.

We think the objections urged by counsel against the legality of "the connection" under discussion are unsupported by facts, and are therefore without force; they are based upon the idea, that this connection of the roads north of the Yallobusha river was a terminus of the road of plaintiff in error, when, in fact, the terminus, as the proof shows, is still at Grenada.

Counsel for the defendant in error contend, that the survey and condemnation of the land of defendant in error, Devaney, by the *jury of review* on the 11th day of November, 1865, to the use of the plaintiffs in error, and upon which the plaintiff in error have built a track from the old line of their road to the track of the Mississippi Central Railroad, are illegal and void.

And, in support of this position, insist that the plaintiffs in error exhausted the power conferred upon them by their charter to take lands *in invitum* when they located their road and constructed it from Memphis, Tennessee, to Grenada, on the south side of the Yallobusha river, and rely upon the cases of *The Little Miami Railroad Company* v. *Nayler*, 2 Ohio State Rep. p. 235; *Morehead* v. *Little Miami Railway Company*, 17 Ohio, 340; *State* v. *Norwalk and Danbury Turnpike Company*, 10 Conn. Rep. 157; *Griffin* v. *House*, 18 John. Rep. 397, a turnpike case; *Louisville and Nashville Branch*

*Turnpike Company* v. *Nashville and Kentucky Turnpike Company*, 2 Swan, p. 282; *Turnpike Company* v. *Hosmer*, 12 Conn. Rep. 364, and other authorities.

This question of the power of railroad companies to take lands *in invitum*, for the purpose of re-locating, repairing, or altering their tracks or lines of road, is now for the first time before this court in the case now under consideration.

The questions involved in the case have been elaborately argued by the counsel of both parties with great ingenuity and distinguished ability.

The first authority we shall notice, relied upon by counsel for defendant in error, is the case of *Morehead* v. *Little Miami Railway Company*, 17 Ohio, 340.

The railway company in this case had located their road through a street in the city of Cincinnati, Ohio, and when in *full operation*, it attempted to make a double track on a lot of a private individual, with a view of abandoning the line of track through the street. The court enjoined the company from further proceedings, giving as their reason for so doing, that " *there was no necessity for the change, and it was not a case for the exercise of any implied power*," citing the case of *The Little Miami Railway Company* v. *Nayler*, 2 Ohio, and affirming it. It will be observed from the language of the distinguished Chief Justice who delivered the opinion of the court in the case, there was "no necessity for the change;" clearly indicating thereby, that, if there had been a necessity for the change, the decision of the court would have been different. The facts of this case differ widely from those of the case under consideration: here, the bridge and the road over it had been destroyed by fire, and their depots *isolated from the terminus of their track on the north side of the Yallobusha river.* The cars were in full operation over their road, through the street, to their depot, in the case of the Little Miami Railroad, and they sought to change their track, as a matter of convenience, clearly. There was no necessity for a change, or for the exercise of *implied powers*. It may not be amiss to state here, that the decision in the Ohio case just referred to, caused the pas-

sage by the legislature of Ohio of an act authorizing all railroad companies in the State, or to be constructed, the power to alter, re-locate, or repair their roads, by taking any lands they saw proper *in invitum*, upon the same terms specified and prescribed by their charters, viewing the decision of the court in 17 Ohio as oppressive, and detrimental to the great railroad interests of that State.

In the next case of *The State* v. *Norwalk and Danbury Turnpike Company*, 10 Connecticut Rep. p. 157, the court, in deciding that the company had not the right to change their toll-gates at discretion, after they had been located, uses this language: " As the power is not given to *commissioners*, but to *proprietors*, whose interests may not always coincide with the *convenience of the public*, to be exercised at their *discretion*, this authority ought not to be extended by construction."

In this decision, the judge who delivered the opinion of the court gives as a reason for the determination of the court, that the rights of the public had to be considered and recognized ; that by construction the company should not have their powers enlarged. The facts of the case showed there was no necessity for the change of gates.

The court, in the case of *Turnpike Company* v. *Hosmer*, 12 Conn. 364, affirms the case of *The State* v. *Norwalk and Danbury Turnpike Company*, 10 Connecticut Rep., and uses this language: " The position of the gates upon a turnpike road is a matter in which the *company on one side*, and the public on the other, are deeply interested." . " That property and dwelling houses must be affected by such a change or alteration."

" It may, indeed, be slight, but still it is entitled to the protection of the law against a trifling injury, unless a fair construction of the charter authorizes the company to inflict it."

In the case of *Griffin* v. *House*, 18 John. Rep. 397 (a turnpike case), this language is used, in the opinion of the court: " That when the discretion had once been exercised the power is exhausted, and cannot be revived, so *as* to authorize the company to change and move their gate to *suit their convenience, without some strong and manifest necessity to warrant it ;*

that the company had acted capriciously, and have *lost sight of the trust* reposed in them, by changing several times the location of the easterly gate, contrary to the *first opinion, and without any apparent necessity for it.*"

The last case cited in this branch of the case before us, is *The Louisville and Nashville Branch Turnpike Company* v. *Nashville and Kentucky Turnpike Company,* 2 Swan, p. 182.

The court, after holding that the company could not change their gate, because the change would affect the right of the *public,* uses this language: " When the charter vests corporations with discretionary power in reference to the exercise of a particular right, and in the exercise of this *discretion,* so conferred, they may make an election (place for a toll-gate), and this *election* is final and conclusive."

" Notwithstanding this is so, however, the corporation may, if it chooses, abandon the use or enjoyment of the *rights secured by election, if no detriment thereby accrues to the public.*"

The courts, in the cases of *Turnpike Co.* v. *Hosmer* and *Griffin* v. *House,* recognize and affirm the rule contended for by counsel of defendant in error, but at the same time give their reasons for the enforcement of the same — *that there was no necessity* shown in either case for the changes of gates sought to be made by them; and that the changes, if made, would work injustice to the "*public,*" who had rights that could not be invaded "*without a manifest necessity for such an invasion.*"

In the case in 2 Swan, p. 182 last mentioned, the court gives the reason for the rule of construction contended for by defendant's counsel, in the remark that the corporation can " abandon the use or enjoyment of the rights secured by election, if *no detriment thereby accrues to the public ;*" thereby clearly intimating, that if *no detriment* should accrue to the "*public* " by a change of gates (the court evidently means, by the use of the word " abandon," that by the abandonment of one gate they had a right to erect another in its stead), the reason for the

rule ceases; and that such alteration of a gate would be legal, although there was no delegated power in the charter to make an alteration, after once locating it.

We can see no reason why railroad companies should not be permitted to alter the location of their depots and their tracks, when no detriment to the public ensues therefrom. If by the alterations the interests of the *public are subserved*, more strongly the reason why the rule contended for by counsel for defendants should not be enforced against them.

Certainly it should not be done if the facts of the case under consideration show this was done.

Counsel for plaintiff in error cites us to the cases of the *N. O. Carrollton Railway Co.* v. *Second Municipality of New Orleans*, 1 La. Ann. Rep. p. 128; *Knight* v. *Carrollton Railway Co.*, 9 La. Ann. Rep. 284; in *Railway ex parte*, 2 Richardson's Rep. S. Ca. 434; and *South Carolina Railway Co.* v. *Blake*, 9 Rich. S. C. p. 229; and rely with confidence upon these cases, as decisive of their view of the question under consideration.

In the first case above cited, the Supreme Court of Louisiana held that the Carrollton Railway Company, having a charter to construct a railroad between the town of Carrollton and the city of New Orleans, gave them the implied right or power to construct a branch, a *branch railway*, to a lot upon which they had erected a depot and turn-table in another part of the city of New Orleans, and off their direct line to their depot, as the terminus of their road.

The court uses this language in their opinion: "The right to establish such a depot results necessarily from the right to *establish and maintain the road*. Consequently, they had the right to run their branch road to it, without any direct authority in their charter authorizing the making of two depots, or a branch road to one of them."

This conclusion was arrived at, notwithstanding the objections here urged, were made and argued with signal ability by the distinguished counsel for the city of New Orleans.

This case was afterwards cited and affirmed in the case of

*Knight* v. *Carrollton Railway Company*, 9 La. Ann. Rep. p. 284, wherein the same questions were involved.

This case has many of the leading features of the case before us.

The case of *Railway ex parte*, 2 Rich. p. 434, was an appeal from the Court of Common Pleas, the petition of the Railroad Company having been denied by this court, for the reasons, "that if it can be shown that the Company has no right to take the property, or where the *public necessity* is doubtful, in both of which cases law and right are concerned, that it should not be taken." "The Company not having the power to take the property of citizens at their discretion, and the *necessity* for the taking the lands of the respondent, for any of the purposes mentioned in the charter, not having been shown to the court, the motion to have commissioners appointed to survey the land and assess damages, must be refused."

This order was reversed by the Supreme Court of South Carolina. Chief-Justice Richardson, delivering the opinion of the court, says: "The Railroad Company had the same power to acquire land, either by grant or by compulsory proceedings, for the purpose of *varying*, altering, and repairing their road, as for the original purpose of locating and constructing it."

The same opinion was adhered to by the court in the case of the *South Carolina Railway Company* v. *Blake*, 9 Rich. p. 229, with a qualification of the rule adopted in 2 Rich., affixing conditions not affecting the principles upon which the cases were decided.

Counsel for defendant in error insists that the rulings of the South Carolina Supreme Court are anomalous, and "must be attributed to the *peculiar* laws of South Carolina, that private property may be lawfully taken for public use, without compensation," "and should not be received as authority in a State with a constitution like ours."

Although it was decided in South Carolina that private property could be taken for public use, without compensation, in the case of *The State* v. *Dawson*, 3 Hill's Rep. 100, there being

no provision in their constitution against such rights of the State.

If the decision of the court is just upon principle, it cannot be effected by the clause in the constitution of South Carolina referred to, because the charters of these companies contain provisions that the companies " shall not take private property without just compensation is first made therefor; " and the mode of obtaining private property, when the same cannot be purchased at private sale, is pointed out in their charter. No effort was made by the Companies to obtain the lands of the parties resisting the right, other than by the manner provided therein.

By recurring to the proof, it will be seen that the railroad of the plaintiff in error had been completed for two years, when their bridge (a " costly structure ") over the Yallobusha river was destroyed. At the same time (June, 1863) the bridge of the Mississippi Central road, over the said river, was destroyed by the military forces by fire.

That, after the close of the war, both companies were so embarrassed by the loss of their rolling stock, and by the destruction of nearly all of their bridges, depots, etc., etc., that neither Company being able to build their bridge over the Yallobusha river, they determined to build a joint bridge on the piers of the Mississippi Central Railroad bridge, left standing, which they did. Permission from the Mississippi Central Railroad Company to the plaintiff in error was granted in this contract for the Company to run their cars over a few hundred yards of the track of the Mississippi Central road, north of the Yallobusha river, for the purpose of enabling the plaintiff in error to run their trains over the partnership bridge, to their depot in the town of Grenada.

These facts show that rival railroad companies, who had no interests in common, were driven, from *necessity,* on account of their crippled finances, caused by the war, to *unite their limited means* for the purpose of *repairing their roads* in this particular.

If either Company could have erected a new bridge, there

certainly would not have been a uniting of their means to build one bridge.

If the Mississippi and Tennessee Railroad Company could have rebuilt their bridge, and the Mississippi Central Railroad Company could not have erected a new one, incalculable advantages would have accrued to the plaintiff in error, by their being enabled to transport their passengers and freight trains directly to their depot in Grenada, connecting with the Mississippi Central track south of the river, thereby controlling and forcing freights and passengers, both ways, over their road.

It will be observed from our inspection of the *diagram* in the record, that it was *impossible* to connect the tracks of the two roads, unless the Mississippi and Tennessee Railroad Company should build a new track, of about five-eighths of a mile in length, from their old track, on the north side of the river, to the track of the Mississippi Central Railroad, a few hundred yards south of the partnership bridge.

This road could not be made unless it passed through the land of the defendant in error.

Application was made to Devaney, by the Mississippi and Tennessee Railroad Company, to purchase the right of way over said land for the contemplated track ; the defendant in error refused to sell the right of way to the Company.    Under this state of the case it would seem the *only alternative left to the plaintiff in error was to rescind their contract with the Mississippi Central Railroad for the erection of the partnership bridge, and surrender their depot, in the town of Grenada,* and establish a depot, on the north side of the Yallobusha river, at the terminus of their old track, *unconnected with the Central Railroad track,* to the great annoyance of the travelling public, to the great detriment of the pecuniary interests of the Company, *if not to its destruction,* or to pursue the course they did in having the land of the defendant in error condemned by a jury of review for the use of the Company, under the provisions of their charter.

Under the circumstances (shown by the proof) existing at this time, the partnership bridge over the Yallobusha river *could*

*not have been constructed unless the contemplated branch road* was also laid, by the Mississippi and Tennessee Railroad Company. . The failure of one would necessarily cause the failure of the other.

As a natural consequence of such failures, the plaintiff in error would have been compelled to abandon their depot at the terminus of their road in Grenada. ·

There was not only a private, but a *great and pressing public necessity* operating upon the plaintiff in error to take the only course left to the Company by which two of the great railroad companies of the State would be enabled to repair their roads, and thereby restore them to active operations over their entire lines.

The travelling public, the great agricultural and commercial interests of the country, were to be benefited by the speedy completion of the roads.

, The provisions of the charter of the plaintiff in error, in § 7, investing the President and Directors of the Company " with all the rights, privileges, and powers requisite and necessary for the construction and repair and maintenance of the road," invested them with the implied power to take lands *in invitum,* after the location and completion of their railroad, *if there was a necessity for the exercise of this power,* for the preservation of some right they would lose without the exercise of it, or for the *repair or maintenance* of their road.

The facts of the case existing prior to the action of the jury of review of the 11th of November, 1865, we think, brings the action of the plaintiff in error, in this particular, clearly within the *exceptions* to the rule, deciding the cases cited, and relied upon by counsel for defendant in error.

If we are right in this view of the law, and the facts of the case under discussion, it follows that the condemnation of defendant in error Devaney's land, by the jury of review of the 11th of November, 1865, was legal, and the land thereby condemned vested in the plaintiff in error on the 14th day of November, 1865, when the $300 land damages, so assessed for the

same, was tendered to the defendant in error by the plaintiff in error.

In this conclusion we are fully sustained by the decisions from 1st and 9th La. Ann. Rep., and 2 Richardson's S. Ca. Rep.

But we may have been mistaken in the disposition of the second question presented by the argument of counsel for the defendant in error; we shall therefore consider the facts of the case shown by the record to have existed *after* the action of the jury of review of the 11th of . November, 1865, and tender of the damages assessed by them on the 14th of November, 1865, by plaintiff in error to defendant in error, with a view to the disposition of the third and last position assumed by counsel for the defendant in error, "That the entry upon the land in controversy, by the Mississippi and Tennessee Railroad Company, constituted them .naked trespassers, and for that reason the iron cross-ties and road-bed, laid upon the land in controversy, was the property of Devaney at the time of the trial of the cases, and that the verdict for their value in favor of defendant in error should not be disturbed."

For the purposes of this discussion, let it be considered that the plaintiff in error had no legal right to enter upon the land in controversy, by virtue of the condemnation made by the jury of review and the tender of the $300 land damages, previous to the passage of the amendment to their charter on the 21st of November, 1865, authorizing the Company to connect their track with the Mississippi Central road on the north side of Yallobusha river. Were they naked trespassers by their entry upon the land after the passage of said act, or did they enter under color of title?

The charter of the plaintiff in error contained provisions authorizing the Company to exercise the rights of *eminent domain*, and to take such lands for the "construction, repair, and maintenance" of their road, as they might see proper to appropriate to their use for these purposes.

The plaintiff in error, believing they had the authority, by the power conferred by sections Nos. seven and eight of their charter, to have the land of the defendant in error taken *in invitum*

after the failure to purchase it from him, caused the impanelling of the jury of review and the condemnation of the land to their use.

Should the plaintiff in error have desisted from entering on the land because the defendant in error considered the action of the jury of review of 11th of November, 1865, void?

There was no other land to be had over which the contemplated branch road could be constructed.

There was no other course left the plaintiff in error but to enter on the land condemned, or attempt to do so; by either course the plaintiff in error would make a case for the adjudication of the power of relocation claimed by the plaintiff in error and denied by defendant in error.

The defendant in error could have enjoined the plaintiff in error from constructing the road: this course would have settled the question of the legality of the action of the jury of review of the 11th of November, 1865.

Counsel say Devaney was not required to do anything; that plaintiff in error knew the order of condemnation of the 11th of November, 1865, was void, and if the Company entered, it was at their peril.

After the passage of the act amendatory of the charter of plaintiff in error aforesaid, defendant in error did not notify plaintiff not to enter upon the land, or enjoin the Company from so doing. The only allegation he could have made in opposition to the entry on the land would have been, that the verdict of the jury of review was void, *because it was done before the passage of the Act of the 21st of November*, 1865, authorizing the Company to connect with the Central road north of the Yallobusha river.

The impanelling of a new jury would have been the consequence, if the injunction had been granted; and a condemnation of the land would have been made, to which there could be no objections raised, except as to the amount of damages, or to the constitution of the jury of review.

But the defendant in error preferred to stand by and see the plaintiff in error enter upon the land, to which they believed

they had a valid title, having complied with every requisition of their charter for their observance in subjecting lands *in invitum* to their use.

The refusal of the defendant in error to receive from plaintiff in error the $300 land damages assessed by the jury of review of the 11th of November, 1865, was no obstacle to the entry of plaintiff in error upon the land in question.

The payment or tender of the money so assessed had first to be made to the defendant in error by the Company before their right accrued to enter upon the lands. This condition precedent having been performed, there was nothing now required of the plaintiff in error by their charter to enable them to enter upon the land condemned as aforesaid to their use.

This, Devaney knew.

After the amendment to the charter of plaintiff in error, all doubts were at an end as to the power of the plaintiff in error to exercise their right of *eminent domain* in procuring land for their branch road. Then why the necessity of having a new jury of review, if the one first impanelled was in all things summoned and organized according to the requisitions of the charter of the plaintiff in error and the law, unless the defendant in error was dissatisfied with the amount of damages assessed by this jury.

The proof shows that the jury was organized and acted in strict accordance with the law and the charter of plaintiff in error.

The law never requires the performance of a vain thing.

If this is true as a principle, was there a necessity for the summoning and impanelling of a new jury of review to do what the first jury had already done? Certainly not, unless the defendant in error required one on the ground that the first did not assess sufficient damages; if he did not consider them large enough, he should have expressed this dissatisfaction to the amount so assessed, by appealing to the Circuit Court of Yallobusha county, or should have demanded the new jury of review.

He did nothing to indicate to the plaintiff in error the aban-

donment of his rights to demand the $300 land damages. The course pursued by the defendant in error relative to the verdict of the jury of review of the 11th of November, 1865, before the entry upon the land in question by the plaintiff in error, and his failure to avail himself of the remedies given to him by the law to prevent an entry upon the same, and his evasion of all objections to the substance of the verdict, preclude him from setting up the objection to this verdict, etc., now made here for the first time, and insisted upon so earnestly by his counsel; they are purely technical, and without legal force.

Viewing the verdict of the jury of review of the 11th of November, 1866, in the light taken of it, as to its legal effect, by the counsel for defendant in error, still we cannot regard the plaintiff in error as a *naked trespasser.* The entry upon the land was *bonâ fide*, under the belief that the title was vested in the Company by said verdict after the tender of the land damages on the 14th of November, 1865, and of the passage of the amendment of their charter of the 21st of November, 1861. All these facts considered, their entry upon the land was clearly under color of title; consequently, the plaintiff in error is entitled to all legal protection to their improvements and property placed upon the track, given by statute to parties in possession under color of title.

The assembling of the jury of review of the 26th of April, 1867 (from the verdict of which defendant in error appealed to the Circuit Court of Yallobusha county, and from the verdict in said court the plaintiff in error has brought the case here by writ of error), was unnecessary; there was nothing for them to operate upon. The verdict of the jury of review of the 11th of November, 1865, having condemned the land to the use of the plaintiff in error, the title was divested out of the defendant in error by the tender of the $300 land damages, on the 14th of November, 1865, and vested in the Mississippi and Tennessee Railroad Company.

The proceedings under the jury of review of the 11th of November, 1865, constituted, we think, a valid defence to the action of ejectment No. 11,057.

We are therefore of the opinion that the court erred in giving the instructions asked by the plaintiff below, and erred in refusing the instructions asked by the plaintiff in error.

The judgments in both cases must be reversed, and a new trial granted in both cases.