The main question which the court is called upon to consider in this case is that of jurisdiction. And the answer to this question depends primarily upon the construction which shall be put upon certain provisions of the act of incorporation of the Providence Worcester Railroad Company, and the acts in amendment thereof, taken in connection with the doings of said company by virtue of the authority conferred thereby.
The petition sets forth that, by virtue of its act of incorporation and the several acts in amendment thereof or in addition thereto, it has located in the town of East Providence a branch railroad connecting with and to form part of its "East Providence Branch Railroad," so called, and running from a point on said East Providence Branch Railroad, near its junction with the Boston Providence Railroad, "thence southerly in and along the Seekonk River to land of said Providence Worcester Railroad Company, *Page 326 
near the Wilkes Barre Pier, so called, and to the east bank of Providence River or Narragansett Bay in said East Providence, and has filed the report of such location, together with a map thereof, with the clerk of said court, pursuant to its act of incorporation and the amendments thereof, and the additions thereto, and to the statute in such cases provided, "and prays for the appointment of commissioners to report and assess the damages to land-owners through which it passes.
If the petitioner now has a corporate franchise to locate, construct, and operate the proposed railroad, then this court has jurisdiction, and should appoint commissioners, as prayed. If, however, the petitioner has no power or authority to do the acts contemplated, then the court is without jurisdiction in the premises, and the petition should be dismissed.
The contention of the petitioner is, that the court has jurisdiction: —
First. Because the authority granted by an act of the General Assembly passed at the January session thereof, A.D. 1870, entitled "An Act in amendment of and in addition to `An Act to incorporate the Providence Worcester Railroad Company,'" has never been exercised, except in part; and hence, so long as said act contains no limitation as to the time within which the authority therein conferred may be exercised, it is competent for the petitioner now to proceed and exercise its power by completing the location and construction of the branch railroad therein authorized; and
Second. That in case the court shall find that the petitioner has already exercised the power of locating and constructing the entire branch railroad contemplated by the said last-named act, that it has not thereby exhausted the power granted by said act in this respect, but that it may proceed to relocate said branch railroad, or any part thereof, under the express powers therein granted.
The contention of the defendants, the Boston Providence Railroad Corporation and the Providence, Warren Bristol Railroad Company, is, that the court has no jurisdiction in the premises: —
First. Because the Providence Worcester Railroad Company *Page 327 
had, prior to its vote of February 4, 1889, assuming to make the location, exhausted its power to locate any railroad under the said Act of 1870.
Second. That the Providence Worcester Railroad Company, by its lease to the New York, Providence Boston Railroad Company, executed May 1, 1888, parted with any franchise to operate and locate a railroad under said act; and
Third. That as the Act of 1870 does not in terms, or by necessary implication, authorize the location and construction of a railroad upon lands held by the Boston Providence Railroad Corporation and the Providence, Warren Bristol Railroad Company for railroad purposes, no location can be made under it upon the lands of the Boston Providence Railroad Corporation and of the Providence, Warren Bristol Railroad Company, held and used by them for railroad purposes.
The defendants, Charles Frazer and another, simply contend that the petitioner, having heretofore located and constructed the branch railroad contemplated by its charter, has thereby exhausted its powers in this respect, and cannot now change said location.
The proof submitted, most of which is matter of record, shows the following to be the main facts in the case, in so far as they are material for the decision of the question raised.
The original charter of the Providence Worcester Railroad Company was passed May 10, 1844, and by section 2 thereof they were "authorized and empowered to locate, lay out, construct, and finally complete a railroad, commencing in the city of Providence; thence to the line of the State of Massachusetts, at or near the village of Waterford; with such lateral branches of said road to any factories or villages on the Blackstone River, or its branches, or the vicinity thereof, as the said company should deem expedient; in such manner as they should deem expedient. And for this purpose the said corporation are authorized to lay out their road not exceeding six rods wide through the whole length; and for the purpose of cutting embankments, and obtaining stone and gravel, may take as much more land as may be necessary for the proper construction and security of said road."
By section 8 of said charter it was provided that: — *Page 328 
"Whenever said corporation shall have located said railroad, or any part thereof, they may make report thereof to the Court of Common Pleas, then next to be holden within and for the county within which said location is made, at any term thereof; wherein they shall particularly describe the bearings of the intended route, or any section thereof, so located, and the names of the owners of the lands through which the same may pass, so far as the same can be ascertained; which report, so made, shall be placed on the files of said court, and notice given thereof to the owner or owners of the land embraced therein, if known, in such manner as the court shall direct, at the expense of said corporation; and said court shall thereupon appoint three discreet and disinterested persons of said county, to estimate all damages which any person or persons whose lands are described or mentioned in such report shall sustain; provided such railroad, or any appendage or appurtenance thereof, be constructed thereon."
Section 14 of said act provides that: —
"If the stock shall not have been subscribed for, the company organized, and the location of the route filed with the Court of Common Pleas of the county within which the land proposed to be taken for the use of said railroad is situated, previous to the first day of June, A.D. 1847, or if the stock being so subscribed, the company organized, and the location made as aforesaid, the corporation fail to complete the said railroad before the first day of June, A.D. 1850, in either of the before-mentioned cases, this act shall be void and of no effect."
In October, 1845, an act was passed by the General Assembly, entitled "An Act construing and amending an Act entitled `An Act to incorporate the Providence Worcester Railroad Company.'" Section 4 of this act is as follows: —
"Said corporation, after having located, or reported as located, or taken, or used land or materials for the uses of their said railroad, shall have power, if they shall find it expedient, to alter the location and vary the direction of their said railroad, in any portion of the general route or of the lateral branches of said railroad contemplated by their charter, and to make a new location of the same in whole or in part; in which case report shall be made, and damages for land or materials taken, or located and proposed to be *Page 329 
taken for the uses of said railroad, shall be estimated or assessed, and like proceedings in all respects had, with like effect, as if said railroad, or the portion thereof located anew, had not before been located; provided, however, that the time allowed by the charter of said corporation for completing their said railroad shall not be extended in consequence of such alteration."
Section 5 provides that: —
"In case of any such new location, the said corporation may, in their report thereof, state what portion of their former location has been abandoned; specifying the person or persons whose lands or materials in whole or any part have been abandoned in consequence of such new location; and if the land or materials of any person before reported as located shall not have been taken and used, all proceedings for the estimate or assessment of damages in favor of said person shall stop; said corporation first paying to every such person whose land or materials located shall have been abandoned as aforesaid, his costs and reasonable expenses, if any, incurred in prosecuting for damages, up to the time of such abandonment, said costs and expenses to be taxed by the court to whom the new location is reported. If the land or materials of any person before reported as located have been taken or used by said corporation as the site of, or in constructing and securing, their said railroad, and the assessment of damages for the same is then pending before the commissioners or a jury, then upon such new location and abandonment as aforesaid, said corporation shall have the right to give said abandonment in evidence in diminution of the damages, paying costs if the question of damages is pending before a jury on appeal, notwithstanding a diminution of the damages in consequence of such abandonment then first given in evidence; or, if the commissioners or a jury have finally assessed the damages said corporation, in case of a new location and abandonment as aforesaid, shall have a right to a revision of the assessment of damages and to a reassessment of the same by a petition to the commissioners, in order that the diminution of damages in consequence of such abandonment may be considered, with right of appeal and upon like terms, to either party, as in other cases. The filing of such petition for revision of damages and notice to the person or persons affected thereby shall perpetually stay all actions or rights of actions for *Page 330 
the recovery of the damages first assessed, the said corporation first making tender of the taxed costs in such action, if any be pending in the clerk's office of the court where the same may be pending, up to the time of such tender."
The Act of 1870, granting authority to locate and construct the railroad in question, in so far as the same is material to the question under consideration, is as follows: —
"SECT. 1. The Providence Worcester Railroad Company is hereby authorized and empowered to locate, lay out, construct, and finally complete on the easterly side of the Seekonk or Blackstone River, a branch railroad from some point south of the Londsdale station, on its present road, to some point on the Providence River, in East Providence, in such manner and form as shall be deemed expedient; and to connect the same with the branch railroad authorized by the Legislature of the Commonwealth of Massachusetts to be constructed in the town of Attleborough, and by a spur track or tracks with the Seekonk River at some point or points above Washington Bridge, and to construct and use for railroad purposes such wharf or wharves, not extending beyond the harbor line, above and below said bridge, as may be deemed expedient.
"SECT. 2. Said branch railroad shall be located, laid out, constructed, and completed in the same manner, with the same powers, and under the same conditions, restrictions, and liabilities for the payment of damages, and in all other respects as now provided by statute, or by an act entitled `An Act to incorporate the Providence Worcester Railroad Company,' or any act in amendment of or in addition to said act; and the same, when so located and constructed, shall be held and used by said corporation in the same manner, and with the same rights, powers, and duties as the railroad constructed under authority of the aforesaid acts is held and used."
In 1873, the Providence Worcester Railroad Company passed the following vote: —
"Voted, That the Providence Worcester Railroad Company, by virtue of its act of incorporation, and of the several acts in amendment thereof, or in addition thereto, hereby locate a railroad from the present line of their railroad at Valley Falls, thence to the Massachusetts line on land of Valley Falls Co., Abbot Run Co., T. Murray, J. Hogg, J. Whistlenant, E. Sibley; and from the southerly *Page 331 
terminus of the branch railroad located through the southerly corner of Attleborough on land of Tingley, Aaron Cole, Joseph Smith, John McGinty, Terence Daley, Darius Goff, Edwin Darling, Elisha Richardson, Olney Hughes, Edwin Darling, John B. Hunt, Thomas Robinson, Pat. McNally, Frank Farrell, Samuel Hedley, Pat. McNally, George F. Wilson, — Charlton, George F. Wilson, in the town of Pawtucket, in a southeasterly direction to the location of the Boston Providence Railroad Corporation, and thence southerly with said last-mentioned location, and upon the same, to land of the Providence Worcester Railroad Company, at Bold Point, in East Providence, the location hereby made being in the towns of Cumberland and Pawtucket and East Providence, in the County of Providence and State of Rhode Island, fully delineated and set forth in three plats forming part hereof, together entitled, `Maps showing the Location of the Branch of the Providence Worcester Railroad from Valley Falls to the India Point Branch of the Boston Providence Railroad, May, 1873,' and verified by the signatures of William S. Slater, president, and Samuel B. Cushing, engineer; the red line thereon indicating the centre line of the road hereby located, and the dark lines on either side thereof showing the exterior lines of said location and the quantity of land embraced therein, and that this location be reported to the Court of Common Pleas for the County of Providence, by the President of this Company."
May 16, 1873, the Providence Worcester Railroad Company reported to the Court of Common Pleas as follows: —
"The Providence Worcester Railroad Company [report] that by virtue of their act of incorporation, and the several acts in amendment thereof, or in addition thereto, they have located a railroad from Valley Falls, in the line of their present railroad, to the west line of the town of Attleborough, there to connect with a branch railroad located under authority from the Commonwealth of Massachusetts, and also a railroad connecting with said branch at the south line of said town, and running thence southeasterly to the railroad location of the Boston 
Providence Railroad Corporation, and thence southerly with said Boston Providence Railroad, and upon and alongside of its said location to land of the Providence Worcester Railroad Company at or near Bold Point, in *Page 332 
East Providence; and that they have particularly described the bearings of the intended route of the railroads so located, and names of the owners of the lands through which the same may pass so far as the same can be ascertained, upon the three plats hereto annexed, and forming part of this report; said plats together being entitled `Maps showing the Location of the Branch of the Providence Worcester Railroad from Valley Falls to the India Point Branch of the Boston Providence Railroad, May, 1873,' and verified by the signatures of William S. Slater, president of the Providence Worcester Railroad Company, and Samuel B. Cushing, engineer.
"And they further report that said location is wholly made in the towns of Cumberland, Pawtucket, and East Providence in said County of Providence."
The plans filed with this location do not show any line of route on the location of the Boston Providence Railroad, but a centre line which begins at that location, and runs to Valley Falls.
August 5, 1873, the directors of the Providence Worcester Railroad Company voted that, —
"This company hereby abandons the location made by resolution of May 14, 1873, and that this company, by virtue of its act of incorporation and of the several acts in amendment thereof, and in addition thereto, hereby locates in the towns of Cumberland, etc., a branch railroad from its present railroad in Valley Falls through land of the Valley Falls Company, etc. (naming the owners), across and the over the location of the Boston 
Providence Railroad Corporation, thence through land of Alpheus Tingley and others (naming other owners), and along, upon, and across the location of said Boston Providence Railroad Corporation, to land of this company's at Bold Point, in said East Providence, the same to be of a width not exceeding at any point one hundred and sixty feet, and not less than eighty feet, and in all respects as laid out on sixteen plats exhibited to this Board, and together constituting `Maps of the Location of the East Providence Branch of the Providence Worcester Railroad from Providence Harbor to Valley Falls, 1873;' and also as to that section of said branch railroad located in the State of Massachusetts as shown on a plat entitled `Map of the location of the East Providence Branch of the Providence *Page 333 Worcester Railroad Company, being station 320-30, station 346, 1873, S.B. Cushing, chief engineer; verified by the signatures of the members present, being a majority of the members of the board of this company, and of S.B. Cushing, civil engineer; the continuous red line thereon indicating the centre line of the railroad hereby located, and the dark lines on either side thereof showing the exterior lines of said location, and the quantity of land embraced therein."
The Providence Worcester Railroad Company, on September 2, 1873, filed with the Court of Common Pleas the following: —
"Respectfully report. . . .
"The Providence and Worcester Railroad Company, that the location made by said corporation, a report whereof was filed in said court on the sixteenth day of May, 1873, has been and hereby is abandoned, and that they have located, by virtue of their act of incorporation, and various acts in amendment thereof, and in addition thereto, a branch railroad from their present railroad at Valley Falls, in a southerly direction to the boundary line of the State of Massachusetts, thence through the town of Attleborough, and thence through the towns of Pawtucket and East Providence, to Bold Point, on Providence River, said location so made anew being delineated and set forth on the plans thereof, contained in seventeen sheets hereto annexed and made part of this report, and entitled `Maps of the Location of the East Providence Branch of the Providence and Worcester Railroad, from Providence Harbor to Valley Falls, 1873,' and verified by the signatures of the president and directors of said company, and of S.B. Cushing, chief engineer."
January 1, 1874, the Providence Worcester Railroad Company reported to its stockholders as follows: —
"The question of reaching tide-water by some route outside the city has finally resolved itself into the building of a branch road by this company, independent of all allies, from Valley Falls, following the east side of the Pawtucket River to Bold Point. The road is under contract, and the work rapidly progressing to completion. With the completion of this branch, affording, as it will, unsurpassed facilities for handling our heavy freight, we can confidently look for a marked reduction in the expense of working our freight department." *Page 334 
Prior to January 1, 1875, the Providence Worcester Railroad constructed and completed its East Providence Branch upon the route located by the vote of August 5, 1873, reported to the Court of Common Pleas, September 2, 1873; and on January 1, 1875, the directors reported to the stockholders as follows: —
"We have completed the East Providence Branch, from Valley Falls to tide-water, and the new year already feels the effect in a reduction of the initial expenses with which we have been burdened at the East Providence end of the road."
January 1, 1876, the directors reported to the stockholders as follows: —
"The East Providence Branch has been put in complete working order, and we already realize its advantages over the old route to tide-water."
On the ninth day of July, 1883: —
"Mr. Thurston, for, and on behalf of, the committee on extension of road to tide-water, made a verbal report to the effect that, at a meeting held on July 2, at which Mr. Whitney, Mr. Weld, and Mr. Folsom attended on the part of the Boston 
Providence Railroad Corporation, and Mr. Leete and Mr. Chamberlain and Mr. Thurston attended for the Providence 
Worcester Railroad Company, it was arranged that the question concerning the East Providence track to tide-water should be settled as follows: —
"First, that the Boston Providence Railroad should grant a perpetual right to this company to make use of the track and roadbed on the location of the Boston Providence Railroad, which they are now using, and have heretofore used, in the form of lease, or otherwise, as counsel of the respective companies may agree.
"Second, this company to pay $2,000 per annum for such right.
"Third, if the town of East Providence should require a bridge or bridges to be built for town purposes so as to carry the highways over the tracks, one third of the cost of such bridge or bridges to be paid by this company.
"Fourth, the sum of $12,000, heretofore agreed on for the occupation of the road, track, and roadbed up to January 1, 1881, to be accepted in full satisfaction for the privilege enjoyed up to said date.
"Which report was accepted and approved. *Page 335 
"On the first day of November, 1884, the Boston Providence Railroad Corporation, and the Providence, Warren Bristol Railroad Company each made to the Providence Worcester Railroad Company a lease of the strip of land within its location upon which the Providence Worcester Railroad Company had constructed its railroad, it being a strip of six feet on each side of the centre line, delineated on sheets annexed to the leases as `described on a page of description prefixed to said sheets, reference to said description and to the alignment table thereto annexed being had.' And the centre line was then described in the leases by courses and distances. The centre line of the twelve foot strip thus described in the leases was the line of route shown on the location plans filed by the Providence Worcester Railroad in the Court of Common Pleas on the 2d of September, 1873, and was in the centre of the track constructed and used by that company up to the time of said leases, and since.
"May 28, 1889, the Providence Worcester Railroad Company, by authority of the legislatures of Rhode Island and Massachusetts, made a lease to the New York, Providence Boston Railroad Company, dated the first day of May, 1888.
"Thereupon, upon the execution and delivery of said lease to said New York, Providence Boston Railroad Company, it did, by the permission of the Old Colony Railroad Company, lessee of the Boston Providence Railroad Corporation, enter into the possession of the East Providence Branch of the Providence 
Worcester Railroad Company, and has since operated it without objection or hindrance on the part of said lessees under said lease, or of the Old Colony Railroad Company, in such manner as it has desired, and is now operating it in the same manner that it operates other portions of the Providence Worcester Railroad."
I will first consider the bearing of the proof thus submitted, upon the question of location. Does it show that the entire branch railroad, contemplated by the Act of 1870, had been located prior to February 4, 1889?
I think this question must be answered in the affirmative.
The word "locate" is not a technical term, and must therefore be interpreted according to its usual and ordinary significance. It is defined by Webster as follows: — *Page 336 
"1. To place; to set in a particular spot or position. 2. To designate the site or place of; as, to locate a public building, a church, etc. 3. To select or determine the bounds or place of; as, to locate a tract of land or a land warrant."
"Located," by the same authority, is, "placed, situated, fixed in place."
The proof shows that the petitioner clearly contemplated the location of said road by its letter of May 1, 1873, to General Lee; that it voted to locate it May 14, 1873; that it formally reported to this court on May 16, 1873, that it had located it, particularly describing in said report and the plats accompanying the same, the lines and bearings of the route, and that subsequently on August 5, 1873, it voted to abandon the location so made, and to make another.
That on September 2, 1873, it filed in this court a report in due form of this second location, whereupon commissioners were duly appointed who proceeded to assess the damages sustained by landowners on account of said second layout.
That in pursuance of this location, the company proceeded to construct and build its road, and did actually build and complete the same as thus contemplated, and so reported to its stockholders, on January 1, 1875, and that it has ever since operated and used the said railroad, without let or hindrance from any person.
But the learned counsel for the petitioner contend that the Providence Worcester Railroad Company has never exercised the power of locating its railroad in reference to the part now sought to be located, because it has merely occupied land belonging to other parties, to wit: The Boston Providence Railroad Corporation, and the Providence, Warren Bristol Railroad Company, permissively at first, and subsequently by virtue of the leases hereinbefore referred to, and not by virtue of the right of eminent domain conferred by its charter, and hence, that as to the part now sought to be located, constructed, and completed under the authority of the charter, the petitioner stands precisely as it would have stood, if it had omitted, from 1870 until the present time, to exercise any of the rights conferred upon it by its charter.
It is true that the petitioner did not acquire the right to use the defendant railroad companies' land now occupied by it by condemnation, *Page 337 
but simply by oral agreement at first, and finally by lease. But this fact, as it seems to me, does not render the road any the less a located road, than though the land had been acquired under the power of eminent domain. If this is not so, then no railroad can be said to be located, as to lands over which it runs, which have been obtained by deed, by license, by prescription, or by perpetual lease, as in this case. It cannot be, I think, that the legislature intended to use the plain word "locate" in any such technical and restricted sense. It is a matter of common knowledge, that very much of the land held and occupied by railroad companies, for all of the purposes connected with the management and operation of their roads, has been obtained by purchase. They are expressly authorized to purchase for said purposes. In the very charter now under consideration, see Act of 1844, sect. 4, it is provided that this company may "purchase lands, materials, and other necessary things . . . for the use of said roads." Suppose it had purchased all of the land necessary for the branch road in question, or even leased it all by perpetual leases, and had laid out and built its road thereon, could it be reasonably said that because it had not condemned the land as it might have done, it had therefore never located its road? I cannot think so. It seems to me to be a forced and unnatural construction that leads to such a conclusion. The lands obtained by purchase are none the less obtained by virtue of the charter, than are those obtained by condemnation, for it is only by virtue of the charter that the land can be obtained at all. Furthermore, if, as is contended in the able argument of the counsel for the petitioner, as to the mile or so of the road in question, the Providence Worcester Railroad Company has never located under any authority given to it under its charter, then it has been guilty of doing that which is clearly ultra vires,
by constructing and operating that part of the road in question, for it is only by virtue of the authority of its charter that it can act at all.
But the petitioner further argues that the proof shows that the location of the road along and upon the land of the Boston 
Providence Railroad Corporation, and the Providence, Warren 
Bristol Railroad, was only a temporary arrangement between it and the said companies, and subject to be broken up at any *Page 338 
moment at the pleasure of the defendant companies; and they cite, in support of this theory, the letter of Governor Clifford, under date of August 15, 1873, to the Providence Worcester Road, in which the following statement appears: —
"I do not see that the plan you have adopted differs in any essential manner from what was understood and agreed to by the committee of our road in their conference with your committee under vote of the 26th of June last, as a temporary mode of making the connection subject to our mutual experience of its operation, to determine whether it shall be changed in the future."
This argument is entitled to careful consideration, and perhaps might be decisive of the question now before me, but for the fact that, after this temporary arrangement had existed for a number of years, formal leases were executed by the Boston 
Providence Railroad Corporation, and the Providence, Warren 
Bristol Railroad Company, of the twelve foot strip which had been before occupied by the petitioner under this uncertain tenure. So that, taking into account both the informal and the formal doings of said railroads in the premises, there certainly came a time, I think, when it could truly be said that the road in question was a located railroad.
Furthermore, the mere fact that the petitioner has not yet been able to obtain the assent of the defendant companies to the lease which it has given to the New York, Providence Boston Railroad Company of its road, and has by reason thereof found it necessary to relocate and reconstruct a part of this branch road, in order to enable it to do what it desires to do; and what probably, under the present circumstances, would be for the best interests of all concerned, namely, to turn over to its lessee, in connection with its other railroad property, this link in the chain of its road, can have no material bearing, as it seems to me, upon the question now before me, for, while it might be highly expedient on the part of the petitioner to acquire a right for such a purpose, it does not therefore follow that such a right now exists.
And still further, it appears by the testimony of Mr. Choate, president of the Old Colony Railroad Company, that the said lessee of the petitioner has been, and still is, in the full possession and enjoyment of this part of said branch road since the making of *Page 339 
the last-mentioned lease; that nothing at all has been done to prevent its operation as the parties desired to occupy it; that the actual operation has not been in the slightest degree interfered with by the Old Colony Railroad Company, by the Boston Providence Railroad Corporation, or by the Providence 
Worcester Railroad Company, and still further, that the public service upon that line by the New York, Providence Boston Railroad, as the lessee of the Providence Worcester Railroad, has been continued as they wish to continue it. Mr. Choate further testified that there was no intention, so far as he was aware, on the part of the road which he represented, to interfere with the use thereof by the present lessee.
Mr. Miller, vice-president of the New York, Providence 
Boston Railroad Company, also testifies that since the time that company took possession of the Providence Worcester Railroad, the branch in question has been operated for the transaction of business over it, and the service of the public, precisely as the Providence Worcester, and the New York, Providence Boston companies desired.
So that, so far as the question of necessity for a new location is concerned, it would seem to be more apparent than real.
And finally, then, upon this question of location, it seems to me, as is well stated in the printed argument of the learned counsel for the defendant railroads, that "The real question in such case is not how the corporation has obtained the land sufficient to enable it to exercise its franchise of constructing and operating a rail. road highway between the two termini, but whether it has, first, exercised its discretionary power of fixing the route of the road between termini, and, second,
exercised its power to build and operate the road upon that route. The power to obtain land upon which to construct and operate the road is only incidental to, and for the purpose of, enabling the power to construct and operate the roads to be exercised."
Having decided, therefore, that the petitioner had, prior to the commencement of the present proceedings, located the entire branch railroad contemplated by the Act of 1870, I now come to the next question, namely, whether it thereby exhausted its power of location under said act. *Page 340 
The answer to this question depends entirely upon the construction to be put upon the said Act of 1870. And it is doubtless true, that, in construing this act, sects. 2, 4, 8 of the Act of 1844, and sects. 4, 5 of the Act of 1845, in so far as the same are applicable, should be considered as forming part thereof. It is also true that the entire body of acts relating to the petitioner should be brought under contribution as far as may be, for the purpose of aiding us in arriving at the true meaning and intent of the particular act before us.
Sect. 4, of the Act of 1845, if taken by itself, seems to confer very broad powers upon the corporation, with regard to changing the location of the road in whole or in part, after it had once been located, and even after lands had been taken and used for the same, subject to the single condition that the road should be completed within the time limited therefor. This section, however, should be construed in connection with all of the other provisions of the act, and particularly, I think, with the section immediately following it, which throws much light upon its meaning.
This section is as follows: —
"SECT. 5. In case of any such new location, the said corporation may in their report thereof state what portion of their former location has been abandoned; specifying the person or persons whose land or materials in whole or any part have been abandoned in consequence of such new location; and if the land or materials of any person before reported as located shall not have been taken and used, all proceedings for the estimate or assessment of damages in favor of such person shall stop; said corporation first paying to every such person whose land or materials located shall have been abandoned as aforesaid, his costs and reasonable expenses, if any, incurred in prosecuting for damages, up to the time of such abandonment, said costs and expenses to be taxed by the court to whom the new location is reported. If the land or materials of any person before reported as located have been taken or used by said corporation as the site of, or in constructing and securing, their said railroad, and the assessment of damages for the same is then pending before the commissioners or a jury, then upon such new location and abandonment as aforesaid, said corporation shall have the right to give said abandonment in evidence in diminution of the damages, *Page 341 
paying costs if the question of damages is pending before a jury on appeal, notwithstanding a diminution of the damages in consequence of such abandonment then first given in evidence; or if the commissioners or a jury have finally assessed the damages, said corporation, in case of a new location and abandonment as aforesaid, shall have right to a revision of the assessment of damages, and to a reassessment of the same by petition to the commissioners, in order that the diminution of damages in consequence of such abandonment may be considered, with right of appeal, and upon like terms, to either party, as in other cases. The filing of such petition for revision of damages and notice to the person or persons affected thereby shall perpetually stay all actions, or rights of actions, for the recovery of the damages first assessed, the said corporation first making tender of the taxed costs in such action, if any be pending, in the clerk's office of the court where the same may be pending, up to the time of such tender."
It seems to me that these two sections, when considered together, as they evidently should be, proceed upon the theory that after the location should have been made, that is to say, after the filing of a location in court, which is the legal act of condemnation, and even after land had been actually taken and used for railroad purposes, by virtue of such proceedings, and during the construction and before the final completion of the entire railroad contemplated by the charter (it will be seen that the act contemplates that it might be constructed in sections; see sect. 7 of the original charter), the company might have found it very desirable and expedient to alter said location in part or in whole, by reason of unforeseen obstacles or difficulties which should be encountered during the progress of the work. But I do not think it was intended by said sections to confer upon the corporation the power of relocation and reconstruction, either in whole or in part, after said railroad and its branches had been once fully and entirely completed and put in operation. I am strengthened in this view by the proviso of said sect. 4, which is as follows: —
"Provided, however, that the time allowed by the charter of said corporation for completing their said railroad shall not be extended in consequence of said alteration."
And also by sect. 14, of the Act of 1844, the last part of which is as follows: — *Page 342 
"Or if the road was not completed before the first day of June, 1850."
The Act of 1845, taken with that of 1844, evidently contemplated in the broad sense the doing of a single thing, to wit: the construction of a completed railroad highway, between the two termini mentioned in the original act, together with certain lateral branches and spurs, and that, when such an undertaking had been fully completed, the object of said acts would be accomplished. Much latitude was necessarily given in the carrying out of so great an enterprise. It will be borne in mind that the art of railroad building was at this time comparatively in its infancy, but I cannot think that either the framers of the act, or the corporators who obtained the same, supposed that, after the contemplated railroad had been once located, constructed, and put into operation, from end to end, together with its adjuncts and lateral branches, it was then in the power of the company to abandon said road in whole or in part, and proceed to build another. Indeed, the time within which the road was to be completed would have precluded the possibility of the making of any very important alteration therein after the work should have once been done.
The provision in said second section to the effect that in case of an abandonment and relocation after the land should actually have been taken and used, and after the damages therefor had actually been assessed, then the corporation should have the right to give such abandonment in evidence in diminution of damages upon the payment of costs, up to the time of the abandonment; and further, that if damages had been finally assessed, the corporation should have the right to a revision of such assessment and a reassessment of the same by the commissioners, also tends to show that whatever changes were contemplated were such as should occur before the final completion of the road. It is also a significant fact, I think, and one which militates against the existence of the power of relocation now contended for by the petitioner, that said act, while providing thus specifically for the reassessment of damages in the cases named, should be silent as to a case where the damages had been actually assessed, and paid prior to any relocation. "The fair inference from the whole act is," says the learned counsel for the petitioner, referring to this omission, "that in such *Page 343 
case the railroad would have the right to enjoy both locations." But can this be so? Might not the possible and ultimate result of such a construction enable the company to construct and operatetwo railroads, in part or in whole, between the termini mentioned, while the charter evidently contemplated only "a" railroad between said termini?
But to illustrate by an exactly parallel case with the one in hand. Suppose that no time had been limited for the building of the road contemplated by the original charter and the Act of 1845, and the company had proceeded to locate, lay out, construct, and complete the same precisely in the manner and at the time it actually did, and suppose further, that after thus completing said road, it had operated it continuously for fourteen years, could it then, under the powers given by said acts, abandon said road in whole or in part, and construct another? I do not think it could. If the suppositions case which I have just stated is parallel to the one in hand, then the petitioner, under its charter of 1870, having located, constructed, and fully completed the road contemplated by said act, has exhausted its powers in this respect, and cannot now relocate and reconstruct the same.
There is still another fact in connection with the Act of 1870 which I think is entitled to some consideration in this matter of the power of relocation. And that is, the fact that, if it is conferred, it is, like the power to locate, conferred without limitation as to time. And while I will not assume to say that such a grant of such a power might not legally be made, yet it being so unusual and so far reaching in its possible consequences, it seems to me if the legislature had intended to confer it they would certainly have done so in the most explict and unequivocal terms.
But even aside from the foregoing reasoning, suppose it is not clear that the power contended for does, in fact, exist? Or, to state it differently, is there a fair doubt as to its existence? It seems to me, after much careful study of the original charter and its amendments, that there is certainly a grave doubt as to the existence of the power contended for. And the rule of construction in such cases unquestionably is, that "Every reasonable doubt is to be resolved adversely. Nothing is to be taken as conceded but what is given in unmistakable terms, or by an implication *Page 344 
equally clear. The affirmative must be shown. Silence is negation, and doubt is fatal to the claim." Fertilizing Co. v.Hyde Park, 97 U.S. 659, 666.
"To be in doubt is to be resolved against a claim of corporate power." "Whatever is doubtful is decisively certain against the corporation." Black v. Delaware Raritan CanalCo. 24 N.J. Eq. 455, 474, 475, 485; State v. Vanderbilt,37 Ohio St. 590, 640, 644; Bank of Pennsylvania v. Commonwealth,
19 Pa. St. 144, 152. See also, under head of "Corporate powers strictly defined," 2 Kent Comment. ed. of 1851, *229; 1 Wood Railroad Law, 463; Howland v. School District, 15 R.I. 184, 187.
I have carefully examined all of the numerous authorities cited on the petitioner's brief, bearing upon the question of the power of relocation. A number of them, notably the California, Kansas, Indiana, Missouri, Illinois, Mississippi, and Alabama cases, undoubtedly sustain the position taken by the petitioner, and mainly on the ground that the original power to take and condemn land is a continuing power, and limited only by the growing necessities of the roads. The fact that the roads therein referred to were built largely through tracts of undeveloped country, and as a means and for the purpose of developing the same, evidently influenced the courts to some extent, in giving a liberal construction to the acts of incorporation. In some of said cases, however, particularly those of Eel River EurekaR.R. Co. v. Field, 67 Cal. 429; Mississippi Tennessee R.R.Co. v. Devaney, 42 Miss. 555; and Peck v. Louisville, NewAlbany Chicago R.R. Co. 101 Ind. 366, the statutes were much broader than the one under consideration. As to the case ofBoston Providence R.R. Corporation v. Midland R.R. Co. 1 Gray, 340, much relied on by the petitioner, I must confess that I fail to see wherein it supports the position taken.
This liberal spirit of construction, however, of such acts, I do not think is in harmony with the tenor of New England cases and of other cases of high authority, and certainly not with the English cases. 1 Wood Railway Law, 643, note 2, and cases cited; 1 Rorer on Railroads, 298, note 4, and cases cited. I am inclined to follow those which hold fast to the strict construction theory, rather than the others. *Page 345 
I am, therefore, of the opinion that the petitioner had, prior to the commencement of the present proceedings, exhausted its power to locate the branch railroad in question, or any part thereof.
But even if I am in error as to both of the conclusions to which I have already arrived, still I am of the opinion that the court has no jurisdiction in this case, because, as to the defendant railroad corporations, at any rate, the land which the petitioner proposes to take and condemn is held by them under their charters, for railroad purposes, and that the proof shows that for the most part, at least, it is necessary for the immediate and prospective use of said defendants for such purposes. In fact, so far as the Bristol Road is concerned, the location takes land actually occupied by the engine house and main tracks of that company. The location is directly across the main tracks of that company and the track by which it reaches the East Providence Branch, and across the tracks by which it reaches its engine house.
Now the law is well settled, as stated by Shaw, C.J., inInhabitants of Springfield v. Connecticut River R.R. Co. 4 Cush. 63, 72, that "The grant of land for one public use must yield to that of another more urgent. Land appropriated to a public walk, or training field, may, in case of war, be required for a citadel, when it is the only ground which, in a military point of view, will command all the defences of a place, in case of hostile attack. But when it is the intention of the legislature to grant a power to take land already appropriated to another public use, such intention must be shown by express words, or by necessary implication. There may be such a necessary implication. Every grant of power is intended to be efficacious and beneficial, and to accomplish its declared object; and carries with it such incidental powers as are requisite to its exercise. If, then, the exercise of the power granted draws after it a necessary consequence, the law contemplates that consequence." See, also, Matter of Boston Albany Railroad Co.53 N.Y. 574; Matter of N.Y. Central Railroad, 63 N.Y. 326;Matter of City of Buffalo, 68 N.Y. 167; Prospect Park ConeyIsland R.R. Co. v. Williamson et al. 91 N.Y. 552; HousatonicR.R. Co. v. Lee Hudson R.R. Co. 118 Mass. 391; Worcester Nashua R.R. Co. v. Railroad Commissioners, 118 Mass. 561;Boston Maine R.R. Co. v. Lowell Lawrence R.R. Co.124 Mass. 368. *Page 346 
Of course there is no difference of opinion between the eminent counsel in the case, as to the correctness of this proposition. But, say the counsel for the petitioner, it is not applicable here because the title of a railroad company acquired under a delegation to it of the functions of sovereignty to condemn land rests upon an entirely different basis than a title to land acquired by purchase, and hence, that express authority must appear to have emanated from the legislature withdrawing, in effect, its grant to one railroad corporation, and conferring it upon another, before such supposed power can be exercised. In other words, as I understand their contention, it is, that so long as the defendant railroad companies obtained the land now proposed to be taken and condemned by the petitioner by purchase (Mr. Benton says they were so obtained), instead of by the exercise of the right of eminent domain, it is subject to the exercise of that power on the part of the petitioner without any express authority therefor in the charter, to the same extent as the land of any private individual. But I fail to see, upon principle, why the lands held by a railroad company for the necessary and ordinary uses of the road, which have been obtained by it by purchase, under the express power given in its charter for this purpose, should not be equally exempt from the exercise of the power of eminent domain on the part of another railroad, seeking to obtain said lands for similar purposes, unless expressly, or by necessary implication, authorized to take and condemn said lands (which is not the case here), as though the same had been obtained by condemnation. Such lands are just as essential for the road, they are used by it precisely the same, they are impressed with a public trust, and the effect of taking them away would be precisely the same as though they had been obtained under the greater power given therefor.
It is true that no cases have been produced in which this doctrine has been directly held, although in Boston MaineR.R. v. Lowell Lawrence R.R. Co. 124 Mass. 368, it appears by the opinion, that part of the land which the defendant was restrained from condemning, because already appropriated to a public use, was obtained by purchase. But the particular question now under consideration seems not to have been directly raised in that case, or in any other that I have been able to find. *Page 347 
The case Matter of Boston Albany Railroad, 53 N.Y. 574, is certainly very nearly in point. In that case the petitioner proposed to take and condemn land held by the village of Greenbush as and for a public park, which land was not obtained by said village under the power of eminent domain, but by gift; but the court held that in the absence of express authority, this land, being already in public use under the sanction of the law, could not thus be taken. See, also, Anderson v. Rochester c.R.R. Co. 9 How. Pr. 553.
The case of Matter of the Petition of the New York,Lackawanna Western Railway Co. 99 N.Y. 12, although not precisely parallel, yet, I think, proceeds upon a similar theory. In that case the land proposed to be taken by the petitioner ininvitum was held by the defendant by purchase, said defendant having no power under its charter to obtain it by condemnation. Defendant was a steamboat company, duly incorporated, and engaged in the business of carrying by water passengers and freight on the great lakes, and using the property in question as a dock or wharf for the landing and delivery of freight. The question before the court was, whether the use of corporate property for the public convenience and for purposes of a quasi public character was sufficient to protect it from the grasp, under the right of eminent domain, of another corporation whose property was held for similar public use. The court held that it was not, and mainly on the ground that the land held by the defendant was not impressed with a public trust. "It might use the lands here in question," said the court, "wholly for the purpose of building and equipping the vessels of its line, and then apply them solely to private uses." "The test appears to be, not what it does, or may choose to do, but what, under the law, it must do, and whether a public trust is impressed upon it." "It does not so hold its property impressed with a trust for the public use unless its charter puts that character upon it so that it cannot be shaken off."
Applying this test to the case at bar, it seems to me that the lands of the defendant railroad companies must, under the circumstances, be exempt.
I do not think that the second point made by the defendant railroad companies, namely, "That the Providence Worcester *Page 348 
Railroad Company, by its lease to the New York, Providence 
Boston Railroad Company, parted with any franchise to locate and operate a railroad under the Act of 1870," is well taken. SeeMatter of the Petition of the New York, Lackawanna WesternRailway Co. 99 N.Y. 12.
I am aware that it is not customary for courts of limited jurisdiction like this to render formal opinions in cases tried before them, but owing to the importance of this case, the number of questions involved, and the great thoroughness and ability with which it has been tried, I deem it justly due to the parties concerned that I should thus give the reasons which have led me to the foregoing conclusions.
For the reasons given in the foregoing opinion, my judgment is, that the court has no jurisdiction in the premises, and hence that the petition must be dismissed.
Petition dismissed.